PER CURIAM.
 

 Appellant Daniel Lugo seeks review of an order which denied postconviction relief under Florida Rule of Criminal Procedure 3.851. Lugo challenged capital convictions for which sentences of death were imposed. This Court possesses jurisdiction pursuant to article V, section 3(b)(1) of the Florida Constitution.
 

 FACTS AND PROCEDURAL HISTORY
 

 A jury convicted Daniel Lugo of first-degree murder (two counts), conspiracy to commit racketeering, racketeering, kidnapping (two counts), armed kidnapping, attempted extortion, grand theft (three counts), attempted first-degree murder, armed robbery, burglary of a dwelling, first-degree arson, armed extortion, money laundering (nine counts), forgery (six counts), uttering a forged instrument (six counts), possession of a removed identification plate, and conspiracy to commit a first-degree felony.
 
 See Lugo v. State,
 
 845 So.2d 74, 91 n. 30 (Fla.2003). Most of these convictions arose from the abduction, extortion, and attempted murder of Marc Schiller, and the abduction, attempted extortion, and murder of Frank Griga and Krisztina Furton.
 
 See id.
 
 at 84. For each murder, the jury recommended the death penalty by a vote of eleven to one.
 
 See id.
 
 at 91. Following that recommendation, the trial court sentenced Lugo to death for both murders and adjudicated him guilty of all thirty-nine counts for which he was convicted.
 
 See id.
 

 [1]
 

 Lugo’s trial included co-defendants Noel Doorbal and John Mese; however, while the charges against Doorbal and Mese were considered and determined by the same jury, the charges against Lugo were evaluated by a separate jury.
 
 See id.
 
 at 97 n. 41. Although the circumstances underlying the crimes charged are somewhat complicated (and are fully detailed in the opinion on direct appeal), a summary of the facts for the Schiller and Griga/Furton counts follows.
 

 The Schiller Counts
 

 Marc Schiller was a wealthy Miami businessman whose firm, in addition to other pursuits, provided services that were reimbursed by Medicare.
 
 See id.
 
 at 84. Schiller hired Jorge Delgado to assist with the Medicare operations, and Schiller eventually sold the Medicare-related portion of his business to Delgado.
 
 See id.
 
 In September or October 1994, Daniel Lugo, a friend of Delgado who at times performed billing work for the Medicare operation, informed Delgado of his belief that Schiller had engaged in improper conduct that had caused them a financial loss.
 
 See id.
 
 at 84 n. 4, 85. Delgado requested that Lugo take action to recover the money that was owed to them.
 
 See id.
 
 Lugo enlisted Doorbal and two other individuals in a plot to kidnap and extort money from Schiller.
 
 See id.
 
 On direct appeal, we analyzed:
 

 After several failed attempts at locating and capturing Schiller, on November 15, 1994, the group finally succeeded in abducting him.... Doorbal and Weekes
 
 *5
 
 grabbed Schiller, and Weekes subdued Schiller, shocking him with a stun gun. Another cohort, Sanchez, assisted Door-bal and Weekes in forcing Schiller into a waiting van. Inside the van, Schiller was handcuffed and duct tape was placed over his eyes. A gun was placed at Schiller’s head, and his. wallet and jewelry [were] removed as the van proceeded to a warehouse that Delgado had rented. He also received additional shocks with the stun gun and he was kicked. Lugo arrived at the warehouse shortly after Doorbal and the others arrived with Schiller.
 

 Schiller’s captors demanded a list of his assets[,] which Schiller initially refused to provide. The refusal resulted in [him] being slapped, shocked with the stun gun, and beaten with a firearm. Weekes questioned Schiller about his assets, based on information provided by Lugo and Delgado. Schiller testified that after he again refused to provide the requested information, he was told that he was going to engage in a game of Russian Roulette.... Schiller’s captors proceeded to read a highly accurate list of his assets to him, demanding that he corroborate what they already knew and that he add to the list assets of which they were not aware. The captors also apprised Schiller that they knew the alarm code for entry into his home....
 

 The captors further threatened that if Schiller did not cooperate, his wife and children would also be abducted and his wife raped in his presence. Schiller was eventually compelled to agree to cooperate but only if his wife and children were allowed to leave the country unharmed. In the ensuing days, Schiller began signing over his assets, including a quitclaim deed for his home, various documents granting access to his checking, savings, and IRA accounts, and authorization for changing the beneficiary of his million-dollar insurance policies.
 

 During Schiller’s captivity, Lugo and Doorbal entered Schiller’s home and removed many furnishings and other items. Lugo, Delgado, and Weekés also began charging thousands of dollars to Schiller’s credit cards. Money in Schiller’s safe in his home was divided among Doorbal, Weekes, and Pierre. Three weeks into Schiller’s captivity, Doorbal and Delgado convinced Lugo that Schiller must be killed, because he had likely surmised the identities of some, if not all, of his captors. A plan was then developed to kill Schiller but to give the appearance that Schiller’s death resulted from the operation of his automobile under the influence of alcohol.
 

 In the fourth week, Schiller was forced to consume large amounts of alcohol to make him intoxicated. Lugo drove Schiller’s Toyota 4-Runner into a utility pole on a Miami-area street to create the impression that Schiller had been involved in an accident resulting from driving while intoxicated. Doorbal and Weekes accompanied Lugo, and Schiller was placed in the front seat of the 4-Runner after it had been driven into the pole. Lugo and Doorbal then poured gasoline on the vehicle and set it ablaze. Lugo, Doorbal, and Weekes had planned to exit the scene in another vehicle that Weekes had driven to the scene, but they noticed that Schiller had somehow managed to exit his burning vehicle and was staggering in the roadway. ... At the urging of Lugo and Doorbal, Weekes used his vehicle to ... run over Schiller. The three left the scene of these events believing they had killed Schiller....
 

 Miraculously, Schiller survived this attempt to take his life. He remembered awakening in a Miami hospital having a
 
 *6
 
 broken pelvis, ruptured bladder, bruises and burns, and temporary paralysis. Lugo and the others eventually learned that Schiller had survived, so they visited the hospital where they thought Schiller was recuperating, with a plan to suffocate him while he lay in his hospital bed. Unknown to Lugo and the others, based upon a well-founded fear for his safety, Schiller had already arranged to be airlifted to a New York hospital to complete his recuperation. Lugo, Door-bal, and some of the other captors proceeded to empty Schiller’s home of the remaining furnishings and valuables.
 

 Id.
 
 at 85-87 (footnotes omitted).
 

 The Griga/Furton Counts
 

 Griga was also a wealthy Miami businessman, and Furton was his girlfriend.
 
 See id.
 
 at 88. After learning of Griga’s significant wealth and seeing his Lamborghini, Doorbal determined that “Griga would be a prime target for kidnapping and extortion,” and he enlisted Lugo to participate with him in the crime.
 
 Id.
 
 at 88. After an initial business meeting with Griga
 
 [2]
 
 and a first failed abduction, Lugo and Doorbal succeeded in kidnapping Gri-ga and Furton:
 

 When Lugo and Doorbal returned to Griga’s home on May 24, 1995, they had concocted the scheme of inviting Griga and Furton to dinner, with the further goal of luring them to Doorbal’s apartment, where the abduction and extortion would begin. Between 10 and 10:30 p.m., Judi Bartusz, a friend of Griga’s, saw Lugo and Doorbal leave Griga’s home in a gold Mercedes, while Griga and Furton left in the Lamborghini.
 

 On May 25, Delgado met Lugo and Doorbal at Doorbal’s apartment. Lugo informed him that Griga was already dead: Doorbal had killed Griga after the two became involved in a scuffle in and around the downstairs computer room in Doorbal’s apartment.[
 
 n.22
 
 ] Griga’s body had been placed in a bathtub in Door-bal’s apartment. Lugo related that when Furton had heard the scuffling between Doorbal and Griga, she rose from her seat in the living room and began to scream when she realized that Griga had been seriously injured. Lugo restrained her and subdued her with an injection of Rompun. Lugo expressed his anger toward Doorbal for having killed Griga before the extortion plan had been completed.
 

 Medical examiner Dr. Roger Mittle-man testified that Griga was a homicide victim. While he could not pinpoint the exact cause of death, he opined that Griga died from one or more of the following causes: an overdose of horse tranquilizer; asphyxia from strangulation, with the overdose of horse tranquilizer contributing to the asphyxiating effect; or blunt force
 
 *7
 
 trauma to his skull and the consequent bleeding (exsanguination) from this blunt force.
 

 Lugo and Doorbal subsequently turned their focus toward Furton. They suspected that she must know the code to enter Griga’s home. Knowledge of the code would allow Lugo and Doorbal to enter Griga’s home with the hope of gaining access to valuables and, most importantly, bank account information for access to much of his wealth. Door-bal carried Furton down the stairs from the second floor of the apartment. Fur-ton was barely clad, wearing only the red leather jacket that she had worn when she left Griga’s home the night before, and a hood covered her head. Not long after Doorbal placed Furton near the bottom of the stairs, although handcuffed, she began screaming for Griga. At Lugo’s direction, Doorbal injected Furton with more horse tranquilizer, causing her to scream again. Lugo and Doorbal then questioned Furton about the security code for Griga’s home. Eventually, Furton refused to answer more questions. Doorbal injected her yet again with additional horse tranquilizer....
 

 Armed with what he believed to be the access code for Griga’s home security, Lugo took Petrescu [Lugo’s girlfriend] to attempt entry while Doorbal and Delgado stayed behind. After failing to gain access to Griga’s home, Lugo called Doorbal on his cellular phone. As the two talked, Petrescu heard Doorbal say, “The bitch is cold,” which she believed was Doorbal’s indication that Fur-ton was dead.[
 
 n.24
 
 ]
 

 Id.
 
 at 88-89 (some footnotes omitted). Lugo and Doorbal subsequently dismembered the bodies of Griga and Furton and disposed of the body parts in two different South Florida locations.
 
 See id.
 
 at 90.
 

 During the penalty phase, the State offered the victim-impact testimony of two witnesses — the father of Krisztina Furton and the sister of Frank Griga. .Lugo offered the testimony of his 71-year-old mother, Carmen Lugo. Mrs. Lugo testified that, as a child, Lugo attended Catholic school and served as an altar boy. She related that Lugo’s father was an alcoholic, on one occasion Lugo’s father struck him on the chest with a hanger, and on another occasion threw food at Lugo because he refused to eat. Mrs. Lugo was of the opinion that Lugo received less favorable treatment than his sister. The family never received complaints about Lugo from school, and he performed well academically. He enjoyed football and was not involved with alcohol or tobacco. Lugo was not violent during his youth, and he received a scholarship -to attend college. Lugo was the only one of her children who provided care when the father suffered from cancer, and Lugo had also provided care for the four children of his former sister-in-law after she died. When asked if she loved her son, Mrs. Lugo replied, “I love him with all my heart.”
 

 Santiago Gervacio, a restaurant owner from Miami, met Lugo in 1990. Gervacio considered Lugo to be a “very good friend,” and he was unaware of Lugo being involved in.any violence. Lugo had two children with his third wife, and he served as the primary caretaker of the couple’s daughter. Gervacio described Lugo as thinking of others before himself. Lugo had loaned money to Gervacio whenever Gervacio asked, and he neither charged Gervacio interest nor pressured him for
 
 *8
 
 repayment. According to Gervacio, the only time Lugo asked to be repaid was when, he was in need of money. Lugo chose not to testify during the penalty phase.
 

 In imposing the death sentence for the Griga and Furton murders, the trial court found five aggravating factors and accorded each great weight: (1) Lugo had been convicted of prior violent felonies; (2) the murders were committed to avoid arrest; (3) they were committed for pecuniary gain; (4) they were committed in the course of a kidnapping; and (5) they were cold, calculated, and premeditated (CCP).
 
 See Lugo,
 
 845 So.2d at 91-92. In addition, the trial court found that the murder of Furton was heinous, atrocious, or cruel (HAC) and accorded that factor great weight.
 
 See id.
 
 at 92. With regard to mitigation, the trial judge did not find any statutory mitigators but did find five non-statutory mitigators:
 

 (1) Lugo was not a totally immoral person and had exhibited great acts of kindness in the past (little weight); (2) Lugo’s execution would have a negative impact on his elderly mother (little weight); (3) Lugo exhibited appropriate courtroom behavior (little weight); (4) Lugo assisted the police ... in finding the torsos of Griga and Furton (very little weight); and (5) life terms for Lugo for each of the murders would permanently remove him as a menace to society (little weight).
 

 Id.
 
 at 92 n. 31.
 

 Direct Appeal
 

 On direct appeal, Lugo raised the following issues: (1) the trial court erred when it denied the motion to sever the Schiller counts, the Griga/Furton counts, and the RICO counts and to have separate trials for each set of counts; (2) insufficient evidence existed to support the convictions for RICO activity and conspiracy to commit RICO activity; (3) the State committed fundamental error during opening statements; (4) his right to a fair trial was denied when Doorbal adversely cross-examined witnesses in an attempt to shift culpability to Lugo; (5) the State improperly introduced evidence of Lugo’s prior fraud conviction and his federal probation to establish his propensity to commit crimes or bad acts; (6) the trial court erred when it prohibited counsel for Lugo from interrogating a witness as to whether a lawyer accompanied her when she was subpoenaed for questioning at the state attorney’s office; (7) Brady
 
 [3]
 
 violations occurred, which warranted that Lugo receive a new trial or the right to conduct further discovery; (8) the State committed fundamental error during closing statements; (9) the trial court erroneously found certain aggravating factors; (10) the trial court improperly weighed or erroneously failed to find nonstatutory mitigating factors which Lugo proffered; (11) the sentences imposed for the noncapital offenses were excessive; (12) the death sentences were disproportionate; and (13) Florida’s capital-sentencing scheme is unconstitutional.
 
 See
 
 845 So.2d at 92-119. This Court denied relief on all claims and affirmed Lugo’s convictions and sentences.
 
 See id.
 
 at 119.
 

 Postconviction Proceedings
 

 On October 18, 2004, Lugo filed an initial motion for postconviction relief which raised a number of claims and requested a competency .evaluation. Two experts evaluated Lugo, and both concluded that he was competent to assist in his postconviction proceedings.
 

 On April 21, 2005, Lugo served an amended motion for postconviction relief,
 
 *9
 
 in which he raised the following claims: (1) Lugo was denied his right to a fair trial because, during voir dire, juror Schlehuber failed to disclose that he had been the victim of a violent crime; alternatively, if this claim is procedurally barred, trial counsel was ineffective for the failure to investigate juror backgrounds; (2) trial counsel was ineffective for the failure to object to improper “Golden Rule” arguments that were made by the State; (3) trial counsel was ineffective for the failure to adequately investigate and present evidence of nonstatutory mitigation; (4) Lugo was denied his right to consular relations under Article 36 of the Vienna Convention; (5) trial counsel was ineffective for the failure to obtain the appointment of a qualified mental-health expert in sufficient time to properly evaluate Lugo for the penalty phase; (6) the State improperly withheld potentially useful information which impeached victim/witness Marc Schiller; and (7) Florida’s sentencing scheme is unconstitutional.
 

 A
 
 Httff
 

 [4]
 

 hearing was held on September 7, 2005, and the postconviction court granted an evidentiary hearing on claim 3 (the failure to investigate and present mitigation evidence) but limited Lugo to presentation of the testimony of former football coaches, friends from New York City (where Lugo was raised), a former girlfriend, and his sister. The evidentiary hearing was initially scheduled for December 1, 2005, but was subsequently continued to January 23, 2006. On December 27, 2005, Lugo sought to amend the post-conviction motion to add four additional claims. The postconviction court denied the motion. After an evidentiary hearing, the court entered an order denying the amended rule 3.851 motion for postconviction relief. Lugo now appeals the denial of the motion.
 

 ANALYSIS
 

 Failure to Investigate or Present Mitigation
 

 In his first claim, Lugo contends that his trial counsel was ineffective during the penalty phase for failing to investigate and offer mitigation testimony with regard to his positive attributes and healthy lifestyle during the time he was a student at Ford-ham University in the early 1980s.
 

 Following the United States Supreme Court’s decision in
 
 Strickland v. Washington,
 
 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), this Court has held that two requirements must be satisfied for an ineffective-assistance claim to be successful:
 

 First, the claimant must identify particular acts or omissions of the lawyer that are shown to be outside the broad range of reasonably competent performance under prevailing professional standards. Second, the clear, substantial deficiency shown must further be demonstrated to have so affected the fairness and reliability of the proceeding that confidence in the outcome is undermined. A court considering a claim of ineffectiveness of counsel need not make a specific ruling on the performance component of the test when it is clear that the prejudice component is not satisfied.
 

 Maxwell v. Wainwright,
 
 490 So.2d 927, 932 (Fla.1986) (citations omitted). With regard to penalty-phase claims of ineffective assistance, a capital defendant must show that but for counsel’s deficiency, the defendant probably would have received a life sentence.
 
 See Rose v. State,
 
 675 So.2d 567, 570 (Fla.1996);
 
 see also Strickland,
 
 466 U.S. at 694, 104 S.Ct. 2052 (“A reason
 
 *10
 
 able probability is a probability sufficient to undermine confidence in the outcome.”). Both prongs of the
 
 Strickland
 
 test present mixed questions of law and fact. Therefore, we defer to the trial court’s factual findings that are supported by competent, substantial evidence, but review its legal conclusions de novo.
 
 See Sochor v. State,
 
 883 So.2d 766, 771-72 (Fla.2004).
 

 Mitigation
 
 — Evidentiary
 
 Hearing
 

 During the evidentiary hearing, Lugo presented the testimony of seven witnesses, including his own and that of original trial counsel. A former state prosecutor and current supreme court judge in the State of New York
 
 [5]
 
 testified that he met Lugo in the early 1980s when they played football together at Fordham University. Lugo was a good teammate, a hard worker, and a friend who was considered to be honest, trustworthy, ethical, and nonviolent. Lugo was not known to use drugs or alcohol. On cross-examination, it was revealed that the witness had never been to Lugo’s home and did not know his family. After 1982, the witness had very little contact with Lugo, and after the spring of 1983, he saw Lugo no more than one dozen times. The witness did not know if Lugo graduated from Fordham University and had never spoken to Lugo since he relocated to Florida. After recounting what he knew about Lugo’s convictions, the witness agreed that the conduct involved was violent, dishonest, selfish, and immoral. The witness conceded that the person who committed these crimes was not the Lugo he had known in 1983.
 

 Oneal Tutein was employed as a football coach at Fordham University from 1981 until 1985. He recruited Lugo from Xavier High School due to the recommendation of the high school football coach. Lugo was a quiet individual who was committed to the football program and was generally popular with the other players. Lugo did not develop deep relationships with his teammates because he commuted to campus but he was “every bit a part of the team.” The coach viewed Lugo as honest, trustworthy, and a fair competitor, and Tutein never knew Lugo to commit a violent act, use drugs or alcohol, or engage in immoral behavior. However, Tutein admitted that he had no contact with Lugo after he left Fordham. After viewing photos of the bodies of Griga and Furton, Tutein testified that he had had no idea of the man Lugo had become and that it was hard to believe that the person he knew in 1982 was capable of these crimes.
 

 An attorney who now owns insurance agencies testified that he and Lugo were on the same football team at Fordham. This teammate viewed Lugo as hardworking, dedicated, honest, trustworthy, generous, and a fair competitor. This teammate also was unaware of any drug or alcohol use by Lugo, and never knew Lugo to have committed any violent acts. This teammate further acknowledged that he only had contact with Lugo through football and, after that, there was no social interaction.
 

 Cindy Velez met Lugo when she was 16 years old — while Lugo was a student at Fordham — and they had a boyfriend-girlfriend relationship. She thought Lugo was a wonderful person with a kind heart who was outgoing, healthy, and nonviolent. She remembered that he attended church, did not use steroids (even though he was a bodybuilder), drugs or alcohol, and did not engage in greedy or immoral behavior. Velez explained that her mother terminated the relationship and sent Velez to Puer-to Rico because Velez was too young to have a boyfriend. After moving to Puerto
 
 *11
 
 Rico many years ago, her first interaction with Lugo was in 2003 when she contacted him on death row. Although Velez expressed her belief that Lugo could be a contributing member of society if not executed, she revealed that she was unsure of the nature of his crimes and did not know how many murder convictions Lugo had received. Velez believed that Lugo “was not the kind of person who would do that.”
 

 Trial counsel was a thirty-eight-year trial veteran and had represented many death-penalty defendants. He had a good relationship with Lugo, and they discussed evidence and trial strategies. Lugo informed him that he did not wish to call mitigation witnesses during the penalty phase — family or otherwise — because he did not want to bring further grief upon his family. Trial counsel requested that Lugo provide him with a list of all persons who might be able to testify in a positive manner on his behalf. Counsel spoke with several of the persons listed as possible witnesses, and he ultimately presented two witnesses during the penalty phase. Although Lugo did not want his mother to testify, counsel presented her at trial because he felt she was a very sympathetic witness and that her penalty-phase presentation was powerful. Additionally, counsel presented Santiago Gervacio as a witness because he knew Lugo
 
 during the time that the crimes were committed
 
 and could offer favorable testimony.
 

 The only information trial counsel obtained from Lugo with regard to his college years was that he was a “decent student and he played football for Ford-ham.” College academic records were not obtained and coaches or faculty were not contacted. Counsel admitted that he did not “investigate the entire State of New York for possible people that knew [Lugo].” With regard to the now-state court judge, counsel believed that he would have been a good mitigation witness. Counsel would have also spoken with coaches if Lugo had identified his former coaches as helpful witnesses. Lugo simply did not list or mention either of these witnesses to his trial counsel. When asked whether he allows his clients to determine the scope of the mitigation investigation, trial counsel replied, “I have to know who to speak to ... I have to know what this person knows that relates to him.... The law may require me to do a lot of things, but if I don’t have information to do it, obviously, I can’t.” With regard to Velez, Lugo never provided his counsel with her name and, further, it was unknown what helpful evidence she could offer because only she knew Lugo during the early 1980s — when she was sixteen and he was eighteen. Trial counsel opined that it would have been “silly” to call a witness to testify under such circumstances “considering that you are before the jury who heard the vivid facts of this case.” For the same reason, trial counsel believed that Lugo’s status as a former college football player would not have assisted him during the penalty phase.
 

 During cross-examination by the State, trial counsel acknowledged that it would not have been beneficial to continually reinforce to the jury that Lugo was an individual who had every opportunity in life, but eventually became a torturer, kidnapper, and double murderer. Presenting the testimony of college friends who had become successful lawyers and businessmen could have invited unfavorable comparisons to Lugo, who this jury heard had turned to a life of crime. Additionally, witnesses who, after reviewing the facts or photos of these crimes, might change their opinion of Lugo (as actually occurred during this collateral proceeding) “would look horrible in front of the jury.”
 

 
 *12
 
 Finally, Lugo testified during the evi-dentiary hearing and denied that he had advised trial counsel not to contact non-family members. He acknowledged, however, that he did not provide his counsel with the names of potential mitigation witnesses from his past. Lugo testified that he had thought of many individuals he would have liked to have presented as witnesses, but he did not have the ability to locate them. He believed that his counsel should have possessed such a capability. Finally, Lugo admitted that, during the evidentiary hearing below, he did not offer the testimony of any witnesses who knew him in 1994; i.e., the time during which he committed the relevant crimes.
 

 Analysis
 

 We conclude that it is not necessary to address whether counsel was deficient because, even if the testimony of these mitigation witnesses had been presented during the penalty phase, Lugo cannot demonstrate a reasonable probability that he would have received a life sentence — that is, a probability sufficient to undermine confidence in the outcome.
 
 See Cherry v. State,
 
 781 So.2d 1040, 1048 (Fla.2000) (citing
 
 Strickland,
 
 466 U.S. at 694-95, 104 S.Ct. 2052). Lugo’s mother was presented during the penalty proceeding, and she established his positive performance in school, his service as an altar boy, and his participation in football. Moreover, Mrs. Lugo provided compelling testimony of good deeds by Lugo, such as caring for his ailing and elderly parents, and taking responsibility for the four children of his former sister-in-law. Further, counsel did present the testimony of Santiago Gervacio — a friend
 
 during the time that Lugo committed the crimes
 
 — who testified that Lugo was a generous and nonviolent person. We conclude that Lugo was not prejudiced by the failure to present the testimony of the witnesses who testified during the evidentiary hearing because the testimony actually presented by the
 
 penalty-phase witnesses
 
 was much more compelling than that of the
 
 eviden-tiary-hearing witnesses
 
 who had not seen Lugo since 1982 and
 
 1983
 
 — more
 
 than a decade before Lugo committed the crimes at issue in this case.
 
 Furthermore, some of the evidentiary-hearing witnesses even testified that the Lugo who committed these crimes was not the Lugo they knew during college.
 

 Although Lugo may have once been an honest, nonviolent, trustworthy individual who was a fair competitor on the football field, the facts of this case — i.e., that Lugo kidnapped, tortured, extorted, and murdered for profit — do not reflect such a person. Any mitigation that could have been derived from these postconviction witnesses would have been insignificant when compared to the brutality, dishonesty, and avarice involved in these crimes, and there is no reasonable probability sufficient to undermine our confidence in the outcome that Lugo would have received a life sentence had this testimony been presented during the penalty phase.
 
 See Rutherford v. State,
 
 727 So.2d 216, 225-26 (Fla.1998) (“Even if the additional mitigation evidence Rutherford presented at the 3.850 hearing had been heard and considered by the jury and original judge, it is not reasonably probable, given the nature of the mitigation offered, that this altered picture would have led to the imposition of a life sentence, outweighing the multiple substantial aggravators at issue in this case.”);
 
 see also Strickland,
 
 466 U.S. at 694, 104 S.Ct. 2052.
 
 [6]
 

 
 *13
 
 Further, the witnesses now suggested could have been detrimental to Lugo because two of his former teammates have achieved professional success' — one as a prosecutor and judge, and the other as an attorney and business owner. If these witnesses had been presented, the jury could have drawn an unfavorable comparison between these witnesses — who became law-abiding, successful members of society — and Lugo, who engaged in a pattern of violent criminal behavior for the purpose of accruing material wealth.
 
 See generally Williamson v. State,
 
 681 So.2d 688, 698 (Fla.1996) (upholding assignment of only “some” weight to mitigation that concerned defendant’s allegedly dysfunctional upbringing where evidence demonstrated that “appellant’s siblings became productive members of society despite a similar upbringing”).
 

 We affirm the denial of the claim that counsel was ineffective for the failure to investigate and present evidence with regard to Lugo’s lifestyle and participation in football during the years that he attended college.
 

 Juror Claim
 

 Lugo next contends that he is entitled to a new trial because juror Schlehuber failed to disclose during voir dire that he had been the victim of a violent crime — a battery. According to Lugo, a police report reflects that a person who made a delivery to a worksite had pushed Schlehuber to the ground. The suspect also allegedly struck him in the face with a closed fist, and punched him several times in the chest.
 

 Lugo and the State disagree with regard to the applicable standard by which we should evaluate whether Lugo is entitled to a new trial. Lugo contends that the three-part test articulated by this Court in
 
 De La Rosa v. Zequeira,
 
 659 So.2d 289 (Fla.1995), applies. Conversely, the State contends that the claim of juror nondisclosure is proeedurally barred, and that to the extent Lugo alleges ineffectiveness of trial counsel, he has failed to demonstrate that a biased juror actually served.
 
 See Carratelli v. State,
 
 961 So.2d 312, 324 (Fla.2007) (“[Wjhere a postconviction motion alleges that trial counsel was ineffective for failing to raise or preserve a cause challenge, the defendant must demonstrate that a juror was actually biased.”). We conclude that Lugo is not entitled to relief under either standard.
 

 With regard to claims of nondisclosure, this Court has held that
 

 [i]n determining whether a juror’s nondisclosure of information during voir dire warrants a new trial, courts have generally utilized a three-part test. First, the complaining party must establish that the information is relevant and material to jury service in the case. Second, that the juror concealed the information during questioning. Lastly, that the failure to disclose the information was not attributable to the complaining party’s lack of diligence.
 

 De La Rosa,
 
 659 So.2d at 241. Lugo has failed to demonstrate that he is entitled to a new trial.
 

 The record reflects that Lugo was indicted for dozens of crimes, including burglary of a dwelling, armed robbery, money laundering, grand theft, uttering forged instruments, and extortion. A number of jurors who were selected to serve on Lugo’s jury disclosed that they had been
 
 *14
 
 victims of crimes similar to those with which Lugo was charged. Trial counsel did not interrogate those jurors about their experiences related to those events. For example, the parties agree that juror Fort reported on her questionnaire that she had been the victim of a robbery. However, during individual voir dire, trial counsel did not ask Fort if her status as a victim of this crime would affect her ability to serve as a juror. The same applies to jurors Dacal and LePow as victims of burglaries. Finally, even though juror Schle-huber disclosed his status as a victim of a theft, trial counsel did not question him during individual voir dire with regard to this crime or whether it would impact his ability to serve as a juror. This pattern reflects that even if juror Schlehuber had disclosed the events at his place of employment, trial counsel would not have inquired further about this crime.
 

 Moreover, Schlehuber’s status with regard to that prior event is an extremely tenuous basis upon which to question his service on the jury that evaluated the charges against Lugo. As described by Lugo, the event involving Schlehuber was a one-time isolated incident which occurred at his workplace during a disagreement. Thus, unlike victim Marc Schiller, Schlehu-ber was not kidnapped, held hostage for approximately one month in a warehouse, tortured by his captors in an effort to extort his assets, placed in a vehicle which was subsequently ignited, and then struck by a motor vehicle after he managed to escape from the burning vehicle. The sheer disparity between the workplace incident and the extended torture and captivity of Schiller causes us to conclude that the workplace incident was not sufficiently material or relevant to service on Lugo’s jury such that a failure to disclose this information requires a new trial.
 
 See generally Conde v. State,
 
 860 So.2d 930, 939 n. 6 (Fla.2003) (juror failed to include in questionnaire information regarding two arrests and to fully reveal information about the arrests during voir dire; Court concluded that nondisclosure “was not material to the degree that the denial of a cause challenge was an abuse of discretion”).
 

 In addition, during group voir dire, the trial judge expressly inquired of the entire group venire whether individuals who had been victims of crime would allow their personal feelings or experiences to influence their decision-making process in Lugo’s case:
 

 COURT: Now, I am sure in a group this size we are going to have plenty of people who have been victims of crime, okay, one crime or another. Or friends or relatives of yours have been victims of crime.... Can we all agree on one thing? Whatever ... you have been a victim of in the past has absolutely nothing to do with whether or not this man committed the crimes he’s accused of[.] Can we agree on that?
 

 VENIRE: Yes.
 

 COURT: Okay. And your role as a juror is to decide, did he commit those crimes. Did the State convince you beyond a reasonable doubt that he committed those crimes.
 

 So you can see that your personal involvement as either a victim or accused really has nothing to do with whether he is guilty or not guilty. Now, that’s logic. Okay. I’m just explaining to you what logically follows from these statements. But you have to tell me what emotionally follows. Every once in awhile I have someone on the jury that says, well, I know that but, you know ... I’m going to take it out on him. I was victimized. Somebody broke in my house. I haven’t gotten over it. I know he may not be guilty in this case. I can’t
 
 *15
 
 separate the two and I’m going to take it out on him. If you feel that way, you can understand why we should know that, because you wouldn’t be a fair impartial juror if you’re going to take it out on this defendant who has nothing to do with your case.
 

 [[Image here]]
 

 We recognize that is something that emotionally may happen. And we would just appreciate your honesty. If you feel you can’t be a fair, impartial juror ... that you are going to hold it against this defendant or the State, even though it’s not logically related, it may be emotionally related; is there anybody who feels that way?
 

 None of the jurors indicated that any of their past experiences as crime victims would impact against Lugo.
 

 The record reflects that the trial judge provided a detailed explanation with regard to how improper emotions could impact the thinking process and provided the jurors the opportunity to disclose if they entertained lingering feelings or resentments that might influence their jury service. After the trial court’s specific discussion, juror Schlehuber did not indicate that his prior altercation at work would affect his ability to be impartial during Lugo’s trial. Therefore, we conclude that the events referenced with regard to juror Schlehuber were neither relevant nor material to jury service in Lugo’s case.
 
 See generally Owen v. State,
 
 986 So.2d 534, 550 (Fla.2008) (trial court did not err in failing to remove juror who had recently been the victim of a home invasion during which her daughter was raped; although juror was a victim of a crime similar to the crime committed by Owen, her responses during voir dire indicated “that she would be able to ‘lay aside any bias or prejudice and render [her] verdict solely upon the evidence presented and the instructions on the law given to [her] by the court.’” (quoting
 
 Lusk v. State,
 
 446 So.2d 1038, 1041 (Fla.1984))).
 

 Further, Lugo is not entitled to a new trial because the failure of juror Schlehu-ber to disclose this workplace event may have been attributable to trial counsel’s limited inquiry. As previously noted, trial counsel did not explore prior experiences as crime victims. During group voir dire by the State, one juror admitted she had failed to state in her questionnaire that she had been the victim of a theft, which
 
 she had not reported to the police.
 
 We have held that
 

 [t]he “due diligence” test requires that counsel provide a sufficient explanation of the type of information which potential jurors are being asked to disclose, particularly if it pertains to an area about which an average lay juror might not otherwise have a working understanding. Thus, resolution of this “diligence” issue requires a factual determination regarding whether the explanations provided by the judge and counsel regarding the kinds of responses which were sought would reasonably have been understood by the subject jurors to encompass the undisclosed information.
 

 Roberts v. Tejada,
 
 814 So.2d 334, 343 (Fla.2002). When trial counsel for Lugo conducted group voir dire, he did not inquire if any of the other jurors had also inadvertently failed to include on their questionnaire altercations, whether reported to the police or whether charges were actually filed. Here, it appears that charges were never pursued against the deliveryman involved with juror Schlehuber, and therefore, at best, an ambiguity may exist which was not explored.
 

 Lugo is not entitled to a new trial under a
 
 De La Rosa
 
 analysis based upon the failure of juror Schlehuber to disclose the
 
 *16
 
 altercation at work. This asserted nondisclosure was simply immaterial and irrelevant to jury service in Lugo’s case, and the failure to disclose was attributable, in part, to the lack of diligence of trial counsel.
 

 Under the “actual bias” standard articulated by this Court in
 
 Carratelli,
 
 Lugo has similarly failed to demonstrate that he is entitled to relief. In
 
 Carratelli,
 
 we explained:
 

 A juror is competent if he or she “can lay aside any bias or prejudice and render his verdict solely upon the evidence presented and the instructions on the law given to him by the court.”
 
 Lusk,
 
 446 So.2d at 1041. Therefore, actual bias means bias-in-fact that would prevent service as an impartial juror.
 
 See United States v. Wood,
 
 299 U.S. 123, 133 — 34[, 57 S.Ct. 177, 81 L.Ed. 78] (1936) (stating, in a case involving a statute permitting government employees to serve as jurors in the District of Columbia, that the defendant in a criminal case still has the ability during voir dire to “ascertain whether a prospective juror ... has any bias in fact which would prevent his serving as an impartial juror”). Under the actual bias standard, the defendant must demonstrate that the juror in question was not impartial — i.e., that the juror was biased against the defendant, and
 
 the evidence of bias must be plain on the face of the record.
 

 961 So.2d at 324 (emphasis supplied). Our analysis with regard to the
 
 De La Rosa
 
 standard defeats any assertion by Lugo that a biased juror actually served on the jury. As we have noted, the trial court engaged in an extended venire discussion to assure that the status of a juror as a crime victim would not impact his or her ability to fairly and impartially adjudicate the guilt or innocence of Lugo with regard to the charged crimes. Juror Schlehuber
 
 did not
 
 indicate that he would be unable to set aside any of his past experiences if he were selected to serve on Lugo’s jury. In
 
 Carratelli,
 
 we held that the defendant failed to demonstrate actual prejudice where the challenged juror explained during voir dire that he could be fair, listen to the evidence, and follow the law.
 
 See id.
 
 at 327. Lugo similarly has failed to demonstrate that juror Schlehuber was actually biased against him.
 
 See id.
 
 at 324. Accordingly, he is not entitled to relief under
 
 Carratelli.
 

 In light of the foregoing, we conclude that Lugo is not entitled to a new trial and we deny relief on this claim.
 

 “Golden Rule” Commentary
 

 Lugo next contends that trial counsel was ineffective for failing to object to improper “Golden Rule” commentary by the State during closing statements. As noted by the State, during his direct appeal Lugo challenged statements made by the prosecutor on this basis:
 

 The prosecutor’s statements which cause us concern are those related to an asserted “Golden Rule” argument. During her closing argument, the prosecutor addressed the jury as follows:
 

 Imagine with tape over your mouth and a hood over your head, imagine it on Krisztina. Not on yourselves, on Krisztina and what Krisztina is going through.
 

 An error is fundamental in nature when it “reaches down into the validity of the trial itself to the extent that a verdict of guilty could not have been obtained without the assistance of the alleged error.” An improper “Golden Rule” argument typically occurs when counsel asks jurors to place themselves in the circumstances of the victim. It extends beyond the evidence and “unduly ereatefs], arouse[s] and inflaméis] the sympathy,
 
 *17
 
 prejudice and passions of [the] jury to the detriment of the accused.”
 
 Urbin v. State,
 
 714 So.2d 411, 421 (Fla.1998) (quoting
 
 Barnes v. State,
 
 58 So.2d 157, 159 (Fla.1951)). The prosecutor unmistakably asked the jurors to place themselves in Furton’s position, which clearly is error. We reject the State’s assertion that the prosecutor’s remarks were merely permissible comments on the evidence. A seasoned prosecutor involved in a capital case knows better than to make an improper “Golden Rule” argument. However, because this incident was isolated, and an overwhelming amount of unrebutted evidence exists against Lugo, we determine that
 
 the error is, on this record, harmless in nature
 
 and therefore deny relief.
 

 Lugo,
 
 845 So.2d at 106-07 (emphasis supplied). Under our precedent, where improper comments by a prosecutor do not constitute reversible error, the defendant cannot “demonstrate the prejudice requisite for a successful ineffective assistance of counsel claim, rendering summary denial of the issue appropriate.”
 
 Hodges v. State,
 
 885 So.2d 338, 356 (Fla.2004). Since we previously held that the “Golden Rule” comments by the State constituted harmless error, the summary denial of Lugo’s claim of ineffective assistance of counsel was proper. Lugo is not entitled to relief on this claim.
 

 Vienna Convention
 

 Lugo contends that his arrest in the Bahamas by Bahamian police violated Article 36 of the Vienna Convention because the Bahamian police failed to contact the United States Consulate in the Bahamas or advise Lugo of his right to contact that consulate. Lugo asserts that we should order suppression of the evidence that resulted from the Vienna Convention violation and either dismiss the indictment or vacate his convictions.
 

 The instant claim is procedurally barred because Lugo could have raised it during his direct appeal.
 
 See Maharaj v. State,
 
 778 So.2d 944, 959 (Fla.2000) (allegation that State failed to comply with its international obligation to inform the consulate that a British citizen had been charged with a capital crime was procedurally barred because it could have and should have been raised on direct appeal);
 
 see also Medellin v. Texas,
 
 — U.S. —, — n. 8, 128 S.Ct. 1346, 1361 n. 8, 170 L.Ed.2d 190 (2008) (citing
 
 Sanchez-Llamas v. Oregon,
 
 548 U.S. 331, 126 S.Ct. 2669, 165 L.Ed.2d 557 (2006), for the proposition that the Vienna Convention does not preclude the application of state procedural bars). Absent the procedural bar, we nonetheless conclude that Lugo is not entitled to relief on this claim. In
 
 Maha-raj,
 
 we concluded that the defendant was not entitled to relief because he has “failed to establish that he has standing, as treaties are between countries, not citizens.” 778 So.2d at 959 (citing
 
 Matta-Ballesteros v. Henman,
 
 896 F.2d 255 (7th Cir.1990)).
 

 Moreover, even if Lugo possessed standing to assert a Vienna Convention violation, he cannot demonstrate that he was prejudiced by any alleged violation. The circumstances presented here are far different from those in which a Vienna Convention violation may arise — i.e., a foreign national commits a crime
 
 in the United States,
 
 and a violation is claimed based upon the fact that the
 
 American officials failed to notify the consulate of the national’s home country. See, e.g., Darling v. State,
 
 808 So.2d 145 (Fla.2002) (capital defendant was a foreign national and citizen of the Bahamas who was charged with first-degree murder in the United States);
 
 Rodriguez v. State,
 
 837 So.2d 478 (Fla. 5th DCA 2002) (criminal defendant was a Mexican national charged with DUI-related crimes in the United States).
 

 
 *18
 
 On the other hand, here, Lugo was an
 
 American citizen in the Bahamas
 
 who was sought by
 
 American officials
 
 for crimes committed
 
 in the United States.
 
 The Bahamian authorities arrested Lugo
 
 at the request of American officials.
 
 Thus, even if Lugo had been advised of his right to contact the American consulate, the consulate would play no part in providing him with legal advice to challenge his arrest by Bahamian authorities
 
 at the request of American officials,
 
 let alone challenge his extradition to the United States
 
 for crimes committed in the United States.
 

 [7]
 

 Finally, even if this issue was not procedurally barred and Lugo could establish that he was prejudiced by a Vienna Convention violation, he would not be entitled to the relief he seeks — i.e., the suppression of statements to the police. This Court has held that suppression of a post-arrest statement “is not an appropriate remedy for an alleged violation of article 36 of the Vienna Convention.”
 
 Conde,
 
 860 So.2d at 953 (citing
 
 United States v. Chaparro-Alcantara,
 
 226 F.3d 616, 622 (7th Cir.2000);
 
 United States v. Cordoba-Mosquera,
 
 212 F.3d 1194, 1196 (11th Cir.2000);
 
 United States v. Li,
 
 206 F.3d 56, 66 (1st Cir.2000); and
 
 United States v. Page,
 
 232 F.3d 536, 541 (6th Cir.2000));
 
 see also Sanchez-Llamas,
 
 548 U.S. at 350, 126 S.Ct. 2669 (“[Njeither the Vienna Convention itself nor our precedents applying the exclusionary rule support suppression of Sanchez-Llamas’ statements to police.”).
 

 In light of the foregoing, we deny this claim.
 

 Brady/Giglio
 
 [8]
 

 Violations
 

 Lugo next contends that the State committed a
 
 Brady
 
 violation because it failed to disclose that Schiller was under federal investigation for Medicare fraud, and that this evidence could have been used to impeach the testimony presented by Schiller during trial. Lugo further asserts that the State committed a
 
 Giglio
 
 violation when it allowed Schiller to falsely testify that he had not engaged in Medicare fraud. We reject both assertions.
 

 During the appeal from the denial of the motion for postconviction relief filed by codefendant Noel Doorbal, Doorbal asserted that the trial court erred when it denied a motion to depose the assistant state attorneys (ASAs) involved in his case based upon the discovery of an e-mail from ASA Levine to her supervisor. According to Doorbal, this e-mail proved that the State withheld exculpatory
 
 Brady
 
 evidence (i.e., that Schiller was guilty of Medicare fraud) and also committed a
 
 Giglio
 
 violation (i.e., it allowed Schiller to falsely testify during trial that he was not guilty of Medicare fraud).
 
 See Doorbal v. State,
 
 983 So.2d 464, 478 (Fla.2008).
 
 [9]
 
 In our analysis of
 
 *19
 
 Doorbal’s claim, we first provided a history of Schiller’s alleged involvement in Medicare fraud.
 
 See id.
 
 at 478-80. We then concluded that codefendant Doorbal had failed to establish either a
 
 Giglio
 
 or a
 
 Brady
 
 violation and affirmed the trial court’s denial of the motion to depose the ASAs.
 
 See id.
 
 at 480-82. Our analysis in
 
 Doorbal
 
 applies equally to this postconviction proceeding and, therefore, we hold that Lugo is not entitled to relief on this claim.
 

 Motion to Amend
 

 In this claim, Lugo asserts that the trial court abused its discretion when it denied his request to amend and supplement his postconviction motion with four additional claims. We disagree. Florida Rule of Criminal Procedure 3.851(f)(4) provides in pertinent part:
 

 A motion filed under this rule may be amended up to 30 days prior to the evidentiary hearing upon motion and
 
 good cause shown.
 
 The trial court may in its discretion grant a motion to amend provided that the motion sets forth the reason the claim was not raised earlier and attaches a copy of the claim sought to be added.
 

 (Emphasis supplied.) The refusal of a trial court to grant a party leave to amend a 3.851 motion is reviewed under an abuse of discretion standard.
 
 See generally Bryant v. State,
 
 901 So.2d 810, 817 (Fla.2005) (stating that we “review discretionary acts by trial judges under an abuse of discretion standard” and holding that “the trial court abused its discretion in striking the initial motion without granting leave to amend”). Discretion is abused only when “the judicial action is arbitrary, fanciful, or unreasonable, which is another way of saying that discretion is abused only where no reasonable person would take the view adopted by the trial court.”
 
 Parker v. State,
 
 904 So.2d 370, 379 (Fla.2005) (quoting
 
 State v. Coney,
 
 845 So.2d 120, 137 (Fla.2003)).
 

 Lugo contends that the challenges to the arrest warrant and the violation of the extradition treaty between the Bahamas and the United States that he sought to add were not previously raised because postconviction counsel “failed to timely identify those claims as factually supported and legally viable.” Postconviction counsel expressly acknowledged that “Lugo had himself mentioned to the undersigned counsel his belief in the factual and legal basis for those claims.”
 

 Invalidity of Arrest Warrant
 

 Lugo initially sought to add a claim that his arrest warrant was invalid based upon the presentation of false information. Lugo asserts that although the affidavit in support of the warrant provided that Schiller recognized Lugo’s voice because of a distinctive lisp, this statement was false because he has never had a lisp. Lugo also contends that the affidavit omitted the fact that police did not believe Schiller when he initially reported the crimes against him.
 

 These facts were readily available to postconviction counsel at the time that Lugo filed his initial rule 3.851 motion and, therefore, these claims should have been raised in that motion. On direct appeal, we stated that “Schiller testified that Lugo’s speech often had a very recogniz
 
 *20
 
 able lisp-like trait.”
 
 Lugo,
 
 845 So.2d at 86. Thus, postconviction counsel should have been aware that Schiller identified Lugo on the basis of an alleged lisp in his speech.
 

 With regard to the claim that Lugo’s arrest warrant was based upon an omission, the direct-appeal record reflects that the deposition of F.B.I. agent Arthur Wells was attached to a brief that was stricken by this Court. In the deposition, Wells testified that when he was first informed of Schiller’s ordeal by Ed Dubois (a private investigator hired by Schiller), he thought that the story was unbelievable and told DuBois that he (Wells) would need to speak with Schiller in person before he would pursue an investigation. Thus, appellate counsel was aware of this alleged omission.
 

 Further, in
 
 Mese v. State,
 
 824 So.2d 908, 919 (Fla. 3d DCA 2002), a dissenting opinion noted that the police initially did not believe Schiller’s explanation of what had occurred:
 

 Schiller decided in April 1995 to report the crime to the police, but after meeting with an investigative officer, Schiller concluded that the police did not believe him and again left the country. It was not until late May 1995 that Schiller was contacted by his investigator and told that there had been a crime similar to the crimes against him and that the police wanted him to return to Miami and give a statement.
 

 The evidence thus shows that the facts of the Schiller kidnaping, extortion and attempted murder are so incredible that it was only after the police learned of the Griga/Furton murders that they began investigating the Schiller incident.
 

 (Ramirez, J., dissenting.) Finally, this was public information due to its publication in a local periodical,
 
 The Miami New Times News,
 
 on December 30, 1999. Since this information was widely available before postconviction counsel filed Lugo’s initial rule 3.851 motion, the trial court did not abuse its discretion when it denied Lugo’s request to amend the motion to add this claim.
 

 Ineffective Assistance of Counsel
 

 Lugo next sought to add a claim that trial counsel was ineffective for the failure to seek suppression of evidence on the basis that the arrest affidavit contained false information that Schiller was able to identify Lugo through his alleged lisp. This allegedly false information was available to postconviction. counsel at the time he filed the initial rule 3.851 motion. Since the trial court did not abuse its discretion when it refused to allow Lugo to supplement his postconviction motion with a claim that challenged the validity of his arrest warrant, we similarly conclude that the trial court did not abuse its discretion when it refused to allow Lugo to amend his motion to add this ineffectiveness claim.
 
 [10]
 

 Lugo also sought to add an ineffectiveness claim based upon trial counsel’s failure to allege a Vienna Convention violation. Lugo sought to add this claim because the United States Supreme Court had recently granted certiorari in
 
 Sanchez-Llamas v. Oregon,
 
 546 U.S. 1001, 126 S.Ct. 620, 163 L.Ed.2d 503 (2005), to address whether the Vienna Convention affords individual rights that may be en
 
 *21
 
 forced by suppression. Although a potential change in the law was possible in light of the Supreme Court’s acceptance of jurisdiction in a case that addressed individual rights under the Vienna Convention, at the time Lugo sought to amend his motion, the established law in Florida was that suppression of a post-arrest statement “is not an appropriate remedy for an alleged violation of article 36 of the Vienna Convention.”
 
 Conde,
 
 860 So.2d at 953. Since trial counsel is not ineffective for the failure to raise a nonmeritorious issue,
 
 see Parker v. State,
 
 611 So.2d 1224, 1227 (Fla.1992), and Lugo would not have obtained relief on his ineffectiveness claim, the trial court did not abuse its discretion when it denied Lugo’s motion to amend.
 
 [11]
 

 Extradition Treaty
 

 During trial, it was revealed that Lugo did not contest extradition.
 
 See supra,
 
 note 7, at 18. Although the treaty between the United States and the Bahamas provides that extradition proceedings may be waived “[i]f the person sought agrees in writing to be surrendered to the Requesting State,” Extradition Treaty, Mar. 9, 1990, U.S.-Bah., Art. 15, Treaty Doc. No. 102-17, Lugo clearly would have known that he did not waive extradition in writing. Thus, Lugo should have challenged the validity of his extradition during the trial proceedings and on direct appeal. Since this claim was procedurally barred, the postconviction court did not abuse its discretion when it denied Lugo’s motion to amend his rule 3.851 motion to add this claim.
 
 See
 
 Fla. R.Crim. P. 3.851(e)(1) (“This rule does not authorize relief based upon claims that could have or should have been raised at trial and, if properly preserved, on direct appeal of the judgment and sentence.”).
 

 Accordingly, Lugo is not entitled to relief on this claim.
 

 CONCLUSION
 

 For the foregoing reasons, we affirm the denial of the rule 3.851 motion by the postconviction court.
 

 It is so ordered.
 

 QUINCE, C.J., and WELLS, ANSTEAD, PARIENTE, and LEWIS, JJ., concur.
 

 CANADY and POLSTON, JJ., did not participate.
 

 [1]
 

 . The trial court ordered that all sentences run consecutively.
 
 See id.
 

 [2]
 

 . Lugo and Doorbal met with Griga "to discuss Griga's interest in investing in phone lines in India.”
 
 Id.
 
 The investment scheme was bogus, but was "designed as a scheme for Lugo and Doorbal to ingratiate themselves with Griga and to gain his confidence.”
 
 Id.
 
 at 88.
 

 n.22
 

 [N.22.] The record reflects that, at some point before he was killed, Griga was injected with Rompun [a horse tranquilizer]. Dr. Allan Herron, a veterinarian, provided expert testimony that the presence of horse tranquilizer in Griga’s brain and liver indicated that he was alive when he was injected. Rompun slows respiration and heart rate, and causes salivation, vomiting, and a burning sensation. Dr. Herron stated that there are no clinical uses for Rompun in humans.
 

 n.24
 

 [N.24.] Dr. Mittleman, the medical examiner, opined that the effects from horse tranquilizer were consistent with the cause of [Furton’s] death. He also stated that her death was consistent with asphyxia.
 

 [3]
 

 .
 
 Brady v. Maryland,
 
 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).
 

 [4]
 

 .
 
 Huff v. State,
 
 622 So.2d 982 (Fla.1993).
 

 [5]
 

 . In New York, the Supreme Court is a trial court.
 

 [6]
 

 . In the instant case, the prior-violent-felony aggravator was established by the attempted murder of Schiller and the contemporaneous murder of the other victim.
 
 See Lugo,
 
 845 So.2d at 91-92. Further, the trial court found that the CCP aggravator applied to the
 
 *13
 
 murders of both Furton and Griga and that the HAC aggravator applied to the murder of Furton.
 
 See id.
 
 at 92;
 
 see also Guardado v. State, 965
 
 So.2d 108, 119 (Fla.2007) ("[B]oth the HAC and CCP aggravators are 'two of the most serious aggravators set out in the statutory sentencing scheme.' " (quoting
 
 Buzia v. State,
 
 926 So.2d 1203, 1216 (Fla.2006))).
 

 [7]
 

 . The trial record further reflects that, rather than contest extradition, Lugo
 
 voluntarily
 
 returned to the United States. Moreover, even if Lugo had decided to challenge extradition, it is unlikely that he would have been successful since death is an available punishment in the Bahamas.
 
 See
 
 ch. 84, § 115, Statute Law of the Bahamas,
 
 available at
 
 http://laws. bahamas.gov.bs/statutes/statute_CHAPTER_ 84.html#Ch84sl 15.
 

 [8]
 

 .
 
 Giglio v. United States,
 
 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).
 

 [9]
 

 . This e-mail stated, in pertinent part:
 

 Alicia Valle AUSA called and told me the[y] got the flip in N.J. They do NOT need Delgado to make the case. BUT, Jack De-naro came to her office and asked her for a plea and she is thinking about making it CONCURRENT. Just what I don’t want. Last week when I spoke with Ms. Rundle about the Natale matter, she told me to make sure that the Feds did not mess me up. That they can just wait because our case is so much more important.... I thought that if we gave the Feds more info so they didn't need Delgado that they would give him consecutive time. I really think
 
 *19
 
 that we need to stand firm on this even if you or Ms. Rundle have to call the powers that be over there. They just seem like they will plead anyone out — But Schiller. That’s the only person they care about even though Delgado is in this for over a million. By the way the deal will also save his entire family. He is looking worse and worse for me.... I rather he be pending charges when I try the case than this cush deal.
 

 Id.
 
 at 478 n. 6.
 

 [10]
 

 . Further, had the evidentiary hearing been held on its originally scheduled date, December 1, 2005, Lugo’s December 27, 2005, motion to amend clearly would have been untimely.
 
 See
 
 Fla. R.Crim. P. 3.851(f)(4). Lugo’s motion to amend was “timely” solely because the evidentiary hearing was continued from December 1 to January 23, 2006. — ■ more than seven weeks later.
 

 [11]
 

 . Had the United States Supreme Court ultimately held that suppression is a remedy for violations of the Vienna Convention, Lugo could have sought relief based upon that ruling. However, in
 
 Sanchez-Llamas
 
 the Supreme Court ultimately held that "neither the Vienna Convention itself nor our precedents applying the exclusionary rule support suppression of Sanchez-Llamas’ statements to police.” 548 U.S. at 350, 126 S.Ct. 2669. Thus, even if Lugo had been allowed to amend his motion to add this claim, he ultimately would not have obtained relief.