PER CURIAM.
Darryl Barwick appeals the circuit court’s denial of his motion to vacate his conviction of first-degree murder and sentence of death filed under Florida Rule of Criminal Procedure 3.851, and petitions this Court for a writ of habeas corpus. We have jurisdiction. See art. V, § 3(b)(1), (9), Fla. Const. As discussed below, we affirm the circuit court’s judgment and deny Barwick’s habeas petition.

I. FACTS AND PROCEDURAL HISTORY

Barwick was indicted on April 28, 1986, on charges of first-degree murder, armed burglary, attempted sexual battery, and armed robbery. A jury found him guilty as charged. The facts underlying the convictions, as summarized by the Court on direct appeal, are as follows:
On the morning of March 31, 1986, Michael Ann Wendt left her apartment in Panama City to travel to Fort Walton Beach. Rebecca Wendt, Michael Ann’s sister and roommate, remained at the apartment complex and lay outside sunbathing until approximately 11:45 a.m. Another resident of the complex who was also outside sunbathing observed a man walking around the complex at about 12:30 p.m. The witness indicated that she saw the man walk toward the Wendts’ apartment and later walk from the Wendts’ apartment into the woods. She subsequently identified that man as Darryl Barwick.
On the evening of March 31, Michael Ann returned to the apartment and found Rebecca’s body in the bathroom wrapped in a comforter. Investigators called to the scene observed bloody footprints at various places throughout the apartment and bloody fingerprints on the victim’s purse and wallet. Rebecca’s bathing suit had been displaced, and she had been stabbed numerous times. An autopsy revealed that she sustained thirty-seven stab wounds on her upper body as well as a number of defensive wounds on her hands. The medical examiner concluded that the potentially life-threatening wounds were those to the neck, chest, and abdomen and that death would have occurred within three to ten minutes of the first stab wound. The examiner found no evidence of sexual contact with the victim, but a crime laboratory analyst found a semen stain on the comforter wrapped around the victim’s body. After conducting tests on the semen and Barwick’s blood, the analyst determined that Barwick was within two percent of the population who could have left the stain.
When initially questioned by investigators, Barwick denied any involvement *91 in Rebecca’s murder. However, following his arrest on April 15, 1986, he confessed to committing the crime. He said that after observing Rebecca sunbathing, he returned to his home, parked his car, got a knife from his house, and walked back to the apartment complex where he had previously observed Rebecca. After walking past her three times, he followed her into her apartment. Barwiek claimed he only intended to steal something, but when Rebecca resisted, he lost control and stabbed her. According to Barwiek, he continued to stab Rebecca as the two struggled and fell to the floor.
Barwick v. State, 660 So.2d 685, 688 (Fla.1995) (footnote omitted).
By a vote of nine to three, the jury recommended that Barwiek be sentenced to death. The trial court followed the jury’s recommendation in imposing a death sentence for the murder conviction. On direct appeal, the Court reversed Bar-wick’s convictions, vacated his sentences, and remanded for a new trial due to an error that occurred during jury selection. Barwick v. State, 547 So.2d 612 (Fla.1989).[1]
Upon retrial, and represented by a different attorney, Barwiek was again convicted as charged.[2] The jury unanimously recommended that Banvick be sentenced to death. In following the jury’s recommendation, the trial court found six aggravating circumstances[3] and no mitigating circumstances. The trial court sentenced Barwiek on the noncapital offenses to two life terms and one thirty-year term.
On direct appeal following retrial, Bar-wick raised five claims pertaining to the guilt phase of his retrial[4] and nine claims pertaining to the penalty phase.[5] While *92 agreeing with Barwick that the trial court erred in finding the CCP aggravating circumstance, the Court found the error to be harmless and affirmed the convictions and sentences on July 20, 1995. Barwick, 660 So.2d at 697.
On March 17, 1997, Barwick filed an initial motion for postconviction relief in the circuit court; Barwick’s amended motion, filed on August 26, 2002, raised twenty-one claims.[6] Following a Huff[7] hearing, *93 in an order dated December 4, 2003, the circuit court granted an evidentiary hearing on four of Barwick’s claims,[8] reserved ruling on the claim of cumulative error, and summarily denied the remainder of his claims. In a second amended motion for postconviction relief, Barwick realleged the original twenty-one claims and raised two additional claims, which the circuit court summarily denied on September 8, 2005.[9]
An evidentiary hearing was held on November 2 and 3, 2006; Barwick and the State each presented two witnesses.[10] The circuit court issued its final order on August 28, 2007, denying Barwick’s rule 3.851 motion. Barwick raises eleven claims on appeal from the denial of postconviction relief,[11] and has also filed a petition for writ of habeas corpus, raising nine claims.[12]

*94
II. MOTION FOR POSTCONVICTION RELIEF

A. Ineffective Assistance of Trial Counsel
Claims of ineffective assistance of trial counsel, whether directed at the guilt or penalty phase of trial, must satisfy two requirements:
First, the claimant must identify particular acts or omissions of the lawyer that are shown to be outside the broad range of reasonably competent performance under prevailing professional standards. Second, the clear, substantial deficiency shown must further be demonstrated to have so affected the fairness and reliability of the proceeding that confidence in the outcome is undermined. A court considering a claim of ineffectiveness of counsel need not make a specific ruling on the performance component of the test when it is clear that the prejudice component is not satisfied.
Ferrell v. State, 29 So.3d 959, 969 (Fla.2010) (quoting Maxwell v. Wainwright, 490 So.2d 927, 932 (Fla.1986)). Review of counsel’s performance “requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel’s challenged conduct, and to evaluate the conduct from counsel’s perspective at the time.” Heath v. State, 3 So.3d 1017, 1027 (Fla.2009) (quoting Strickland v. Washington, 466 U.S. 668, 689, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)).
The prejudice prong of the two-part test presents the issue of whether the specific deficiency in counsel’s performance rises to the level that there is a reasonable probability that, but for counsel’s unprofessional error, the result of the proceeding would have been different. Strickland, 466 U.S. at 694, 104 S.Ct. 2052. “A reasonable probability is a probability sufficient to undermine confidence in the outcome.” Hutchinson v. State, 17 So.3d 696, 700 (Fla.2009) (quoting Strickland, 466 U.S. at 694, 104 S.Ct. 2052).
1. Failure to Challenge Bay County Circuit Court’s Jury Qualification Procedure
Barwick contends that his constitutional rights were violated based upon the general jury qualification procedure of the Bay County Circuit Court. Barwick identifies the following facts in support of his claim: (1) the general jury qualification is held outside the presence of both the defendant and his attorney; (2) the State is allowed to participate in the proceeding; and (3) the proceeding is not recorded. Barwick argues that these facts distinguish his case from the Court’s prior decisions holding that the general juror qualification procedure does not constitute a critical stage in the proceedings. See Wright v. State, 688 So.2d 298, 301 (Fla.1996). Barwick further argues that the *95 lack of a record of the jury qualification proceeding in this case, in conjunction with the destruction of all records relating to the jury pool before his conviction became final, denied him a right to a proper appeal. According to Barwick, under the circumstances of his case, he is entitled to a new trial.
Barwick did not raise this claim on direct appeal; therefore, the claim is procedurally barred. Orme v. State, 896 So.2d 725, 737 (Fla.2005); Gorby v. State, 819 So.2d 664, 674 & n. 8 (Fla.2002). Moreover, even if renewable, Barwick’s claim would be denied as a matter of law. Bar-wick did not establish the facts he relies upon to distinguish his case from the Court’s prior decisions on the issue; in fact, testimony from the evidentiary hearing refutes the alleged factual distinctions. See Orme, 896 So.2d at 737. Finally, cases cited by Barwick, including Delap v. State, 350 So.2d 462 (Fla.1977), and Blalock v. Rice, 707 So.2d 738 (Fla. 2d DCA 1997), are distinguishable. Unlike Barwick’s case, a new trial was warranted in the cases he relies on because a full transcript of a critical stage or stages at trial was unavailable thereby precluding complete appellate review. We affirm the circuit court’s denial of relief.
2. Failure to Effectively Cross-Examine State’s Witness Suzanna Capers[13]
At trial, State’s witness Suzanna Capers identified Barwick as the man she saw walking around the apartment complex where both she and Ms. Wendt lived, staring at Ms. Capers, and then walking towards Ms. Wendt’s apartment. Barwick argues that trial counsel’s cross-examination of the witness was ineffective, having failed to (1) bring out the fact that it was only after extremely prejudicial photo lineups and several improper comments by law enforcement officials that Capers finally identified Barwick as the man she saw; and (2) impeach Capers’ trial testimony with inconsistent testimony she provided at Barwick’s first trial, as well as in her deposition. The circuit court rejected Bar-wick’s claims of ineffective assistance, concluding that there was no issue as to the identity of the killer because Barwick gave a taped statement admitting he killed Ms. Wendt and describing his actions.
On appeal, Barwick does not address his pretrial admission to police, a statement properly admitted at trial. Thus, Barwick has failed to demonstrate how he was prejudiced with respect to counsel’s cross-examination of Ms. Capers pertaining to her difficulty with identifying him in police photographic lineups.
The Court also rejects Barwick’s claims pertaining to counsel’s handling of the alleged inconsistency between testimony at Barwick’s first trial and deposition and that given at his second trial. Bar-wick takes issue with Ms. Capers’ description of her impressions of Barwick’s actions when she observed him outside the apartment complex on the day of the murder. According to Barwick, Ms. Capers’ testimony changed from describing her impression that Barwick looked “like an innocent man” trying to decide which way to walk, to an impression that Barwick was staring at her and gesturing towards Ms. Wendt’s apartment, which made her suspicious and feel uneasy. Barwick’s characterization of Ms. Capers’ testimony at his second trial as “significant,” however, fails to identify how counsel’s failure to impeach her with the inconsistencies resulted in *96 prejudice. We affirm the circuit court’s denial of relief.
With respect to the guilt phase of trial, Barwick has not demonstrated prejudice in light of his admission to unlawfully entering the victim’s apartment while armed with a knife and stabbing her to death, as well as the evidence admitted at trial supporting the attempted sexual battery conviction. That conviction did not rely upon the witness’s impressions from her observations of the defendant.[14] Barwick’s claim as it relates to the penalty phase of trial also is without merit; the jury returned a unanimous verdict recommending a death sentence, and there exist five valid aggravating circumstances, with minimal mitigating evidence, supporting the sentence.
3. Failure to Present Mitigating Evidence During Penalty Phase
Barwick contends that he was denied adversarial testing based upon counsel’s failure to present mitigating evidence during the penalty phase of trial. Barwick alleges that trial counsel relied solely upon the investigation done by the attorney who originally represented Barwick. He further argues that trial counsel failed to present the jury with a true picture of Barwick’s extensive mitigation and tragic home life, including years of sexual, physical, and mental abuse, and failed to compile and present to the jury a clear record of Barwick’s mental deficiencies, learning disabilities, and psychological problems.
At the penalty phase of trial, defense counsel presented seven mental health experts and seven lay witnesses. They testified as follows.
Dr. Annis, a clinical psychologist, examined Barwick in September 1986. Dr. An-nis talked with Barwick and reviewed depositions of family members as well as the statements they gave to law enforcement officers. Dr. Annis read Barwick’s statements to police and talked to jail personnel familiar with Barwick from his prior incarceration. Psychological testing reflected that Barwick is of average intelligence, performs better on motor than verbal skills, and his reading ability is very low. Barwick does not suffer from either bipolar disorder or schizophrenia. Dr. Annis learned that Barwick’s father was an angry, violent man who often struck his children. Dr. Annis told the jury that individuals who were victims of violence as children have a stronger tendency than most people to resort to aggression as adults when they are frustrated. Dr. An-nis concluded that Barwick was not legally insane at the time of the murder and did not suffer from any mental defect or disease. Dr. Annis testified that at the time of the murder, Barwick knew the difference between right and wrong, was aware of the consequences of his actions, and was not under the influence of an extreme mental or emotional disturbance. Likewise, Barwick’s capacity to appreciate the criminality of his conduct at the time of the murder was not impaired. Dr. Annis also was of the opinion that Barwick meets the criteria for antisocial personality disorder.
*97 Dr. Loiry, also a clinical psychologist, examined Barwick in October 1990. Dr. Loiry did not detect any attempt on Bar-wick’s part to deceive. Barwick was very cooperative and they had a normal interaction. As requested, Dr. Loiry tested Bar-wick and forwarded those results to another mental health provider.
Dr. McClaren, another clinical psychologist, first examined Barwick in September 1986. Dr. McClaren read reports and talked with members of Barwick’s family and girlfriend, family friends, police officers, probation officers, and jail personnel. Dr. McClaren opined that Barwick’s overall IQ score was 103, placing him in the average range. However, Barwick has a degree of brain dysfunction that may have shown itself in the form of learning disabilities at school, and has difficulties in the sexual area. These difficulties were related to what happened in the homicide. The violence in Barwick’s household, at the hands of his father, could have contributed to Barwick’s difficulties. Dr. McClaren diagnosed Barwick as having an antisocial personality disorder, while concluding that he meets the criteria for the former classification of a mentally disordered sexual offender. In Dr. McClaren’s opinion, neither statutory mental mitigator applied at the time of the murder.
James Beller, a master’s level clinical psychologist, also testified for the defense. He administered psychological tests and spent between six and seven hours with Barwick. Barwick has an overall average IQ, but exhibited a rather serious left temporal lobe deficit that is most likely a learning disability. Barwick has difficulty integrating information and has a significant memory problem. Mr. Beller told the jury that Barwick’s test results could indicate organic brain damage. This kind of brain damage is not the type that causes someone to be deranged or have behavioral problems. Mr. Beller testified that Bar-wick reported he had an abusive childhood that had warped his personality and turned him into an abnormal person. In Mr. Beller’s opinion, Barwick could not function in a way that most of us would accept as normal behavior. Mr. Beller believes that Barwick is a psychopath and a sexual deviant. He is also an obsessive compulsive and has a dissociative disorder. Mr. Beller also believes that Barwick is schizoid. A schizoid has difficulty relating to people and experiences a split reality. Mr. Beller believes Barwick knew what he was doing at the time he committed the murder, but could not control himself.
Dr. Warriner, a forensic psychologist, testified that he first saw Barwick when he was just thirteen years old. Dr. Warriner evaluated Barwick at the request of an attorney who defended Barwick on juvenile charges, and did a considerable amount of psychological testing. Dr. War-riner believed, at that time, that Barwick could be rehabilitated. There was no evidence, however, that Barwick received treatment. Dr. Warriner evaluated Bar-wick again in 1983 at the request of another attorney when Barwick was charged with sexual battery. Dr. Warriner did not recommend treatment for Barwick. Dr. Warriner evaluated Barwick for a third time, when he was accused of committing the murder for which he was subsequently convicted and sentenced to death. Dr. Warriner realized that he had been wrong in 1980 when he opined that Barwick could be rehabilitated. In 1983, after Barwick was charged with rape, Dr. Warriner concluded that Barwick was a psychopathic sexual deviant. Dr. Warriner advised Bar-wick’s lawyer at the time that he could not help him. Dr. Warriner came to the same conclusion in 1986, concluding that Bar-wick was a psychopathic sexual deviant who shows an escalating pattern of uncontrollable sexual acts. For instance, Bar- *98 wick exposed himself and hit a girl after she called him a name. Another time, when he was thirteen, he touched a lady inappropriately. These events were accumulating since Barwick was age thirteen. There were likely more episodes of escalating violence for which Barwick was not caught. Such behavior is part of the sexual psychopathology. Barwick’s abusive upbringing typically would have an effect on his behavior. Dr. Warriner testified that people like Barwick are rare, and are also extraordinarily dangerous because they can pass for a normal person during a casual, social contact. Barwick is at risk for repetition of his behavior, and should be confined from the public.
Dr. Hord, a clinical psychologist, testified that he was appointed to conduct a competency examination upon Barwick in 1986. Dr. Hord interviewed Barwick, administered psychological tests and examined background information. Barwick’s verbal IQ is 90. In Dr. Hord’s opinion, Barwick is very unstable and disturbed.
Dr. Walker, a psychiatrist, testified via deposition. He evaluated Barwick in June 1992. Barwick was not legally insane at the time of the murder. However, Bar-wick suffers from intermittent explosive disorder. This is a condition in which people, normally males, have temper tantrums that are beyond the conception of the usual temper tantrum. When they blow up, it is difficult for them to stop what they are doing. Frequently, such people black out during an explosive episode. Dr. Walker believed that at some point during the attack, Barwick blacked out and became temporarily unaware of what was going on. Dr. Walker testified that Bar-wick is a sexual deviant, one who enjoys forcing sexual attention on women. Bar-wick’s abusive background could have affected his behavior on the day of the murder. Victims of physical or sexual abuse frequently identify with their abuser. In turn, they can get a thrill, and then a sexual thrill, from physically abusing other people. Dr. Walker further opined that Barwick has a great deal of trouble with impulse control. His impulse control focuses on sexual behaviors. Once he had the thought that he wanted to have sex with someone, it would be difficult to deter him. There is no cure for Barwick’s condition. Barwick should be institutionalized and off the streets. In addition to intermittent explosive disorder, Dr. Walker indicated in his written report that Barwick also has antisocial personality disorder. Dr. Walker could not explain, however, why he included both diagnoses when a finding of antisocial personality disorder precludes a diagnosis of intermittent explosive disorder.
Barwick also called several lay witnesses during the penalty phase.
A sister, Lovey Barwick, testified that there were seven siblings in the family and Barwick was the youngest. Each of the children was physically abused by their father. Depending upon how angry their father was, punishment could include being slapped or receiving black eyes. It did not matter which child was in trouble; the siblings were equally abused. At school, the Barwick children would lie if asked about how they had received the bruises that were observed. As far as Lovey Bar-wick could remember, the defendant did not skip school. No one contacted social services on their behalf. Their father also beat them mother. For a period of time, how long she did not remember, them father left the family to be with another woman. During cross-examination, Lovey Barwick testified that she felt her brother Glen was beaten as much as the defendant, that no other siblings had been charged with murder, and that the good times were about equal to the bad times.
*99 William Barwiek, the defendant’s brother and two years older, similarly testified to the abusive childhood environment. The defendant had been knocked unconscious after hitting a rocking chair following a punch from their father. William Barwiek recalled one time when he and Barwiek had been hit with a piece of rebar. The Barwiek children were required to attend church regularly. For a month or two their father had run off with the preacher’s wife. William Barwiek continues to work with their father. None of the defendant’s brothers or sisters have been arrested for rape or murder. William Barwiek did not think that the bad outweighed the good from his childhood.
Janice Santiago, the defendant’s half-sister and ten years older than Barwiek, also testified about the abuse. She described the Barwiek children as being timid around the house, that it was like walking on eggs. The abuse was so bad that after she moved out, she called the state agency responsible for investigating reports of child abuse. She made the report after learning that her step-father had discharged a loaded gun into the floor of the family house after wrestling the weapon away from one of Barwick’s brothers. Bar-wick was seven years old when she moved out of the family house.
Barwick’s mother, Ima Jean Barwiek, testified that Barwiek grew up in a violent home, where the violence was directed at both her and the children. She stayed with the defendant’s father because she believed keeping the family together was the right thing to do. She testified that her husband did not drink in front of her and she did not believe he drank, but his anger flared up when least expected and was instantaneous. She did not remember any of her sons having to be treated by a doctor as the result of the beatings. She did think, though, that she had heard something about a shotgun incident.
Barwick’s father, Ira Barwiek, testified, admitting he beat his children with anything within his reach, including two-by-fours and metal rebar. He also admitted that during one of his rages, he hit Bar-wick’s brother with a shovel. During another violent episode, Barwiek was knocked unconscious. Barwick’s father testified that he did not think there was anything wrong with how he disciplined his children. He treated his sons the same between them. He testified that he drank occasionally, and he hit his sons whether he was drinking or not. On cross-examination, he testified that Barwiek was working for him at least part-time in 1986, and that his son William is back working with him.
Sheila Morgan, who lived across the street from the Barwicks, also testified on behalf of the defense. She witnessed Ira Barwiek beat his sons in front of the Bar-wick house. At one time her husband and other male neighbors spoke with Barwick’s father, telling him that the abuse had to stop or they would take action.
Barwick’s probation officer, Ernest Langford, testified that he first met with Barwiek on January 18, 1986, to review conditions of probation and other matters pertaining to his probation. On March 31, 1986, between 2 and 3 p.m., Barwiek sought his help, stating that he needed counseling. At the time, Barwiek was accompanied by his girlfriend, and was very courteous and respectful, as on prior occasions. Ernest Langford was not aware that Barwiek had previously been subject to psychiatric evaluation and did not recall whether there was any reference to or information about that in Barwick’s file.
At the evidentiary hearing held on his rule 3.851 motion, Barwiek presented the testimony of Dr. Hyman Eisenstein, a psy *100 chiatrist. Dr. Eisenstein testified that the difference between Barwick’s verbal and performance IQ scores indicated possible neurological or neuropsychological impairment of the left hemisphere of his brain. Dr. Eisenstein further testified that Bar-wick’s mother fell down a flight of stairs while pregnant with Barwick, and that he was an unwanted child. With respect to childhood abuse, Dr. Eisenstein reported that Barwick was subject to constant beatings by his father and had been knocked unconscious a number of times as a child, and that he suffered severe emotional abuse. Consequently, Barwick’s brain deficiencies would affect his ability to interact with people; Barwick also would not know how to deal with sexually charged situations. Dr. Eisenstein did not ask Barwick about the details of the murder and had not read Barwick’s confession to the murder.
In denying Barwick’s amended motion for postconviction relief, the circuit court found Dr. Eisenstein’s testimony to be cumulative to that presented at the penalty phase of trial through Barwick’s experts and his family. Trial counsel does not provide ineffective assistance for failing to present cumulative evidence. Kilgore v. State, 55 So.3d 487 (Fla.2010); Maharaj v. State, 778 So.2d 944, 957 (Fla.2000).
The primary differences between Dr. Eisenstein’s testimony and the testimony of Barwiek’s expert witnesses at trial is Dr. Eisenstein’s opinion that both statutory mental mitigators, i.e., the defendant acted under the influence of extreme mental or emotional disturbance, and defendant’s capacity to conform his conduct to the requirements of the law was substantially impaired, apply to Barwick’s case and his disagreement with the defense experts’ antisocial personality disorder diagnosis. However, the Court has consistently rejected the proposition that trial counsel’s performance is deficient simply because a defendant finds an expert, in postconviction proceedings, that will testify more favorably for him. Hertz v. State, 941 So.2d 1031, 1040 (Fla.2006). Further, Barwick does not address the impact on Dr. Eisenstein’s opinions due to his failure to review Barwick’s confession to police and confession to his brothers and father, as well as the police and sentencing reports pertaining to Barwick’s prior rape case. Similarly, Dr. Eisenstein admitted during cross-examination that Barwick met four of the seven criteria of antisocial personality disorder, and three or more are required to make the diagnosis.
At trial, counsel presented the testimony of family members as lay witnesses to establish the violent childhood experienced by Barwick and expert testimony to explain the effect of that environment on Barwick. The fact that some testimony proved to be unfavorable to Barwick does not undermine our confidence in the verdict; Barwick’s own expert in this postcon-viction proceeding testified to many of the same prejudicial facts. Under these circumstances, we affirm the denial of relief on this claim.
4. Failure to Challenge the “Avoid Arrest” Aggravating Circumstance and to Object to the Instruction on the Aggravator
Here, Barwick’s claim of ineffective assistance is based upon a possibility that counsel did not challenge or otherwise object to the “avoid arrest” aggravating circumstance. Barwick’s claim is limited to his assertion that counsel had a duty to know the law with respect to challenging penalty phase instructions. Our careful review of the record establishes, however, that trial counsel did object to the aggra-vator:
*101 MR. ADAMS [defense counsel]: And I note one other item at this time, Judge. The instruction with regard to aggravation as to the crime for which the defendant is to be sentenced was committed for the purpose of avoiding lawful arrest or avoiding escape from custody. Did you mean for that to be in there?
MR. PAULK [prosecutor]: Yes.
MR. ADAMS: Of course I surely ...
THE COURT: I think there is evidence that when the crime was committed, that the crime was committed to escape detection or apprehension.
MR. PAULK: Yes, Your Honor, the two witnesses testified as to the fact that she removed the mask, he knew he had to kill her because he didn’t want to go back to prison. That complies with the Supreme Court decision that appears at 547 2d 1257.
THE COURT: Preventing lawful arrest or affecting escape from custody. Your objection is noted. [Volume XXV, at 904-5.]
Moreover, Barwick attempts to incorporate his argument as raised in his habeas petition. We affirm the denial of relief upon this claim, because
general references to other pleadings are not sufficient to preserve a challenge in a collateral proceeding. See generally Duest v. Dugger, 555 So.2d 849, 852 (Fla.1990) (“Merely making reference to arguments below without further elucidation does not suffice to preserve issues, and these claims are deemed to have been waived.”).
Floyd v. State, 18 So.3d 432, 459 (Fla.2009).
5.Failure to Ensure a Complete Appellate Record
With respect to Barwick’s claim of an alleged insufficiency of the record on appeal, his claim of ineffective assistance of trial counsel is, in actuality, one of ineffective assistance of appellate counsel. The claim is not cognizable in a rule 3.851 proceeding, and should instead be raised in a habeas petition. Cook v. State, 792 So.2d 1197, 1201 (Fla.2001).[15] This claim is denied.
6. Failure to Object to Instructions and Comments by the State and Trial Court that Diminished the Jury’s Sense of Responsibility in Sentencing
Barwick argues that he was denied the effective assistance of trial counsel based upon counsel’s references to the jury’s sentence as a “recommendation,” and counsel’s failure to object to certain comments made by the State and the trial court that diminished the jury’s sense of responsibility. However, Barwick does not provide argument in support of this claim, and fails to identify the statements to which he believes counsel should have raised objections. Accordingly, having failed to direct this Court’s attention to the statements which purportedly diminished the jury’s responsibility, Barwick has waived this claim. See Floyd, 18 So.3d at 459.
7. Failure to Object to Arguments by the State Introducing Impermissible Considerations to the Jury or to Seek a Curative Instruction
Barwick contends that the State introduced impermissible considerations to the jury, and that trial counsel rendered *102 ineffective assistance upon his failure to object or seek a curative instruction. Bar-wick does not, however, identify the prosecutor’s allegedly impermissible arguments; instead, he relies upon the argument as raised in his habeas petition. Therefore, the claim is waived and relief denied. See Floyd, 18 So.3d at 459.
8. Failure to Challenge the Aggravator “During Commission of a Felony” as an Automatic Aggravator
Barwick contends trial counsel was ineffective in having failed to object to the aggravating circumstance that the murder was committed during the commission of a felony. Barwick provides no argument, stating that the claim is also raised in his habeas petition and is “incorporated as if argued herein.” We deny this claim pursuant to Floyd, 18 So.3d at 459. Furthermore, the Court has previously rejected the underlying substantive issue as a matter of law. See, e.g., Dufour v. State, 905 So.2d 42, 69 (Fla.2005) (citing cases); Blanco v. State, 706 So.2d 7, 11 (Fla.1997); Johnson v. State, 660 So.2d 637, 647 (Fla.1995) (citing cases). Accordingly, counsel will not be held to have rendered ineffective assistance in not bringing a nonmeritorious claim. See Lugo v. State, 2 So.3d 1, 21 (Fla.2008).
9. Failure to Challenge Penalty Phase Instructions as Shifting Burden of Proof
Barwick does not set forth any argument in claiming that trial counsel was ineffective for failing to challenge the penalty phase jury instructions as shifting the burden of proof to the defendant. Rather, as in other claims, he relies upon the argument made in his petition for writ of habeas corpus. This claim, therefore, is waived. See Floyd, 18 So.3d at 459.
B. Brady, Giglio, and Prosecutorial Misconduct Claims
Barwick contends that with respect to exculpatory evidence not disclosed to the defense and certain testimony pertaining to the attempted sexual assault of which he was charged and convicted, the prosecutor violated Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). Barwick also argues that the prosecutor -violated Giglio when he elicited testimony from Ms. Capers describing her impression of Bar-wick when she saw him walking around the apartment complex.
The following rules of law and standards of review govern the Court’s consideration of these claims.
To establish a Brady violation, the defendant must show “(1) that favorable evidence — either exculpatory or impeaching, (2) was willfully or inadvertently suppressed by the State, and (3) because the evidence was material, the defendant was prejudiced.” Rodriguez v. State, 39 So.3d 275, 285 (Fla.2010) (quoting Riechmann v. State, 966 So.2d 298, 307 (Fla.2007)). To establish prejudice, the defendant must show that the favorable evidence could reasonably be taken to put the entire case in such a different light as to undermine confidence in the verdict. Strickler v. Greene, 527 U.S. 263, 290, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999). A Brady claim presents a mixed question of law and fact. Therefore, the Court will defer to the lower court’s factual findings if they are supported by competent, substantial evidence, but will review that court’s application of law to facts de novo. Mordenti v. State, 894 So.2d 161, 168 (Fla.2004); Way v. State, 760 So.2d 903 (Fla.2000). The Court also reviews the cumulative effect of the suppressed evidence de novo. Mordenti, 894 So.2d at 168.
*103 To demonstrate a Giglio violation, a defendant must prove that (1) the prosecutor presented or failed to correct false testimony; (2) the prosecutor knew the testimony was false; and (3) the false evidence was material. Taylor v. State, 62 So.3d 1101 (Fla.2011); Guzman v. State, 941 So.2d 1045, 1050 (Fla.2006). “Once the first two prongs are established, the false evidence is deemed material if there is any reasonable possibility that it could have affected the jury’s verdict.” Davis v. State, 26 So.3d 519, 532 (Fla.2009), cert. denied, — U.S. —, 130 S.Ct. 3509, 177 L.Ed.2d 1097 (2010). A Giglio claim also presents a mixed question of law and fact, and a reviewing court will defer to the lower court’s factual findings if they are supported by competent, substantial evidence, but will review the court’s application of law to facts de novo. Sochor v. State, 883 So.2d 766, 785 (Fla.2004).
1. Medical Examiner’s Reports
Barwick argues that two investigative reports from the medical examiner’s office, not disclosed by the State, refute evidence of an attempted sexual assault. Barwick claims that the reports reflect that the bathing suit was not pulled down in the back. Barwick then contends that, inconsistent with the medical examiner’s reports, was trial testimony presented by the State that “the top of the bathing suit was pulled down and the rear of the bottoms were pulled down in the back.” Barwick claims that, consequently, the State either knew or should have known that the testimony adduced was false. In addressing the materiality of the failure to disclose and admission of false testimony, Barwick argues that the only evidence at trial that supported the attempted sexual assault conviction was the testimony of the lead officer concerning the positioning of the victim’s bathing suit on her body, and a semen stain found on a comforter wrapped around the victim.
The circuit court concluded that Barwick failed to establish either a Brady or Giglio violation:
The testimony and photographic evidence at trial showed Ms. Wendt’s bathing suit was pulled down in back. Furthermore, in his taped statement played to the jury, the defendant was questioned by Captain Frank McKeithan about how Ms. Wendt’s bathing suit was pulled down. In response, the defendant stated her bottom may have come down “when they was wrestling around”. (Trial record Vol. V, 317) There was also evidence of the defendant’s semen being found on the blanket that was wrapped around the body of Ms. Wendt after she was stabbed to death. Furthermore, at the evidentiary hearing, Captain McKeithan testified that the term “intact” meant, to him, that the bathing suit was not torn or ripped. Investigator Don Cioeta testified at the evidentia-ry hearing that when Ms. Wendt’s body was unwrapped from the bedspread, the top of her bathing suit was intact and the bottoms had been pulled down a bit in the back exposing her buttocks.
First, contrary to Barwick’s conclusion that the medical examiner’s reports “show that the victim’s bathing suit bottom was not pulled down,” one report provided that the victim’s bathing suit bottom was “in place,” while the second report stated that it was “intact and in place.” We disagree that these descriptions are self-explanatory. Further, Barwick did not present testimony at the evidentiary hearing from the medical examiner’s office or anyone responsible for preparing the reports. Consequently, Barwick has failed to establish the first prong of the Brady análysis, that the medical examiner’s reports were favorable.
*104 Secondly, Barwick has not demonstrated that the defense did not receive the medical examiner’s reports. While Barwick’s rule 3.851 motion states that postconviction relief counsel received the reports through a chapter 119 records request, the defendant did not present evidence establishing that the reports had not been made available to the defense. To the contrary, the assistant state attorney who prosecuted the case testified at the evidentiary hearing that the state attorney’s office maintained an open discovery policy, furnishing everything to the defense initially when a request was made, followed by supplementation.
Third, we also conclude that Bar-wick has not demonstrated the materiality of the reports as required under Brady, even assuming they should have been and were not disclosed. The State called Don Cioeta, the former crime scene investigator with the sheriffs office, to testify at the evidentiary hearing. Mr. Cioeta had photographed the crime scene, including photographs which were admitted at trial showing the placement of the bathing suit following the discovery of Ms. Wendt’s body. While Mr. Cioeta testified that he believed he took the photographs after the victim had been rolled over, he had no recollection of the body being dragged into the bathroom.
Barwick’s related Giglio claim is equally unavailing. Barwick again assumes the meaning of “intact” is that the bathing suit was completely and properly positioned on Ms. Wendt’s body, and thus then McKeith-an’s testimony that the bathing suit bottom was pulled down was false.[16] That assumption, however, is insufficient for Bar-wick to meet his burden under Giglio.
Accordingly, we affirm the circuit court’s denial of Barwick’s Brady and Giglio claims pertaining to evidence of the victim’s bathing suit.[17]
2. Uncorrected Testimony from State’s Witness, Suzanna Capers
Barwick also raises a Giglio claim with respect to the testimony of State’s witness Suzanna Capers, based upon the State’s failure to point out to the jury that she testified at a prior proceeding that she perceived Barwick’s conduct, on the day of the murder, as innocent and unworthy of concern.
The circuit court, in denying Barwick’s postconviction claim, concluded as follows:
The defendant has failed to establish that he is entitled to any relief under this claim. First, the defendant has failed to show that Ms. Capers’ trial testimony was, in fact, false. Second, there is no showing that the State knew that Ms. Capers’ impressions of the defendant’s conduct at the second trial was false or was the result of the passage of time and reflection. Finally, the identity of the defendant was never an issue *105 in this case. As noted previously, the defendant had confessed to killing Ms. Wendt. Therefore, the defendant cannot establish that Ms. Capers’ testimony as to his behavior could reasonably have affected the outcome of the trial. See Guzman v. State, 868 So.2d 498 (Fla.2003).
On appeal, Barwiek contends that Ms. Capers’ change in testimony was highly prejudicial because the jury did not hear the witness say she had seen an innocent man walking around the complex, mumbling to himself, but instead that she saw a suspicious man who was trying to indicate something to Capers or frighten her in some way.
We reject Barwick’s claim. Barwiek does not demonstrate that the witness’s testimony as to the facts she observed has changed, only that Ms. Capers’ interpretation of those facts differed between her 1986 and 1992 testimony. Thus, Barwiek has not established that the witness’s testimony was false.
3. Prosecutorial Misconduct
Barwiek also argues that the prosecutor engaged in misconduct, having had a conversation with a confidential defense expert appointed to assist the defense, without the consent and presence of the defendant. Barwiek alleges this unauthorized contact with Dr. Walker hindered the preparation of his mitigation evidence by depriving him of a confidential expert.
In denying relief, the circuit court concluded that Barwiek made no showing that he had been adversely affected in the preparation of his mitigation evidence. In addition, the information received by the State was the same that Dr. Walker testified to at trial, i.e., that Barwiek suffered from an impulsive disorder and that he did not fall within the legal definition of insanity. We affirm the circuit court’s denial of relief. At the evidentiary hearing Barwiek neither called his former confidential expert to testify concerning the nature of his conversation with the State, nor questioned the assistant state attorney who prosecuted the case about the issue during cross-examination of the witness.
C. Cumulative Error
Barwiek argues that in light of the number and types of errors that occurred, and taken as a whole, his trial was fundamentally unfair. Barwiek contends that the trial court was required to engage in a collective, rather than item-by-item review. However, where allegations of individual error are without merit, a cumulative error argument based thereupon must also fail. See Downs v. State, 740 So.2d 506, 509 n. 5 (Fla.1999). The circuit court properly denied relief on this claim.

III. PETITION FOR WRIT OF HABEAS CORPUS

Barwiek raises nine issues in his petition for writ of habeas corpus, claiming the following: (1) as a brain-damaged, mentally retarded person with a mental and emotional age less than eighteen years, Bar-wick’s execution would be unconstitutional; (2) use of a prior conviction involving an offense that occurred before Barwiek was eighteen years old violates the federal constitution pursuant to Roper v. Simmons, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005); (3) direct appeal counsel’s failure to argue against the “avoid arrest” aggra-vator constituted ineffective assistance; (4) direct appeal counsel rendered ineffective assistance having failed to raise the issue of omissions in the record; (5) counsel’s failure to argue on direct appeal that the jury was misled during the penalty phase by improper comments and instructions was ineffective assistance; (6) ineffective assistance of direct appeal counsel based upon counsel’s failure to argue that the *106 prosecutor presented to the jury at sentencing impermissible matters for consideration; (7) the “during the commission of a felony” aggravating circumstance operates as an impermissible automatic aggra-vator; (8) appellate counsel on direct appeal rendered ineffective assistance having failed to argue that the penalty phase jury instructions impropei'ly shifted the burden of proof to the defendant; and (9) the Court erred in failing to remand the case to the trial court for resentencing, having struck an aggravating circumstance.
A. Roper v. Simmons
Barwick makes two claims that his execution would be unconstitutional under Roper v. Simmons, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005). He argues he cannot be executed because, first, his mental age is less than eighteen due to brain damage and mental capacity, and second, use of a prior violent felony committed before the age of eighteen as an aggravating circumstance is improper. These claims are procedurally barred.
This Court has held that “[h]abeas corpus is not to be used for additional appeals of issues that could have been, should have been, or were raised on appeal or in other postconviction motions.” Mills v. Dugger, 559 So.2d 578, 579 (Fla.1990). In Mills, we rejected the petitioner’s habeas claims, noting that most had been raised either on direct appeal or in the petitioner’s post-conviction motion. See id. In this case, appellant has already raised Roper in his rule 3.851 motion. Because every argument raised in this portion of appellant’s habeas petition either could have been or in fact was raised in his motion filed pursuant to rule 3.851, this claim is rejected as procedurally barred.
Schoenwetter v. State, 46 So.3d 535, 562 (Fla.2010).
In addition to the procedural bars, the Court has expressly rejected the argument that Roper extends beyond the Supreme Court’s pronouncement that the execution of an individual who was younger than eighteen at the time of the murder violates the eighth amendment. England v. State, 940 So.2d 389, 406-07 (Fla.2006). Moreover, the Court has previously denied relief on each of the specific claims raised by Barwick. See Hill v. State, 921 So.2d 579, 584 (Fla.2006) (“Hill’s third claim is that his mental and emotional age places him in the category of persons for whom it is unconstitutional to impose the death penalty under [Roper], This claim is without merit. Roper does not apply to Hill. Hill was twenty-three years old when he committed the crimes at issue. Roper only prohibits the execution of those defendants whose chronological age is below eighteen.”); Lowe v. State, 2 So.3d 21, 46 (Fla.2008); Melton v. State, 949 So.2d 994, 1020 (Fla.2006). Here, Barwick was nineteen and one-half years old when he committed the murder. Accordingly, we deny relief upon these claims.
B. Ineffective Assistance of Appellate Counsel
Barwick raises a number of claims of ineffective assistance of direct appeal counsel. The Court has previously addressed the applicable standard for such claims brought in petitions seeking habeas corpus relief, as follows:
Appellate counsel’s ineffectiveness is properly raised in a petition for writ of habeas corpus. See Freeman v. State, 761 So.2d 1055, 1069 (Fla.2000). In order to grant habeas relief on the basis of ineffectiveness of appellate counsel, this Court must determine whether the alleged omissions are of such magnitude as to constitute a serious error or substantial deficiency falling measurably outside the range *107 of professionally acceptable performance and, second, whether the deficiency in performance compromised the appellate process to such a degree as to undermine confidence in the correctness of the result.
Pope v. Wainwright, 496 So.2d 798, 800 (Fla.1986). “The defendant has the burden of alleging a specific, serious omission or overt act upon which the claim of ineffective assistance of counsel can be based.” Freeman, 761 So.2d at 1069.
Rimmer v. State, 59 So.3d 763, 786 (Fla.2010).
1. Failure to Argue “Avoid Arrest” Aggravator
Barwick argues that appellate counsel was ineffective because he failed to argue that the jury should not have been instructed on the “avoid arrest” aggravator. Barwick contends that appellate counsel should have argued that the State failed to present sufficient evidence to support the aggravator.
The focus of the avoid arrest aggravator centers on the motivation for the crimes. See Jennings v. State, 718 So.2d 144, 151 (Fla.1998). “[T]o establish the avoid arrest aggravating factor where the victim is not a law enforcement officer, the State must show beyond a reasonable doubt that the sole or dominant motive for the murder was the elimination of a witness.” Reynolds v. State, 934 So.2d 1128, 1156 (Fla.2006) (quoting Bell v. State, 841 So.2d 329, 336 (Fla.2002)).
McGirth v. State, 48 So.3d 777, 792 (Fla.2010), cert. denied, — U.S. —, 131 S.Ct. 2100, 179 L.Ed.2d 898 (2011). To determine whether the “avoid arrest” ag-gravator is supported by the evidence, the Court considers whether the victim knew and could identify the killer, whether the defendant used gloves or wore a mask, whether the victim offered any resistance, or whether the victim was in a position to pose a threat to the defendant. Parker v. State, 873 So.2d 270, 289 (Fla.2004). Sufficient evidence to support the “avoid arrest” aggravator exists where the defendant has made incriminating statements about witness elimination. Walls v. State, 641 So.2d 381, 390 (Fla.1994) (holding a confession that witness elimination was the reason for the murder satisfies this aggravating circumstance). The Court will uphold an aggravator where the trial court applied the right rule of law and where competent, substantial evidence supports the finding. Owen v. State, 862 So.2d 687, 698 (Fla.2003).
The evidence at trial, as found by the trial court in its sentencing order, established the “avoid arrest” aggravating circumstance:
In the 1983 sexual battery case of which the defendant was convicted, he was identified and arrested because the victim was left alive. In that case the victim convinced him that although she had seen his face after his mask had been removed that she would not turn him in. The defendant learned what is obvious, that being, if the victim is dead the victim cannot identify the perpetrator. In this case, the defendant told his sister, Lovey Barwick, that when he and the victim where [sic] struggling and she saw his face that he knew then that “he had to do it.” Further, the defendant told his brother, William Barwick, that during the struggle when the mask came off and the victim saw his face he then knew that he had to kill her because he was not going back to prison. Less than 80 days after he was discharged from prison, for committing a sexual battery where he left the victim alive, he attempted to commit another sexual battery using the same modus operandi and *108 this time he did not leave the victim alive to identify him.
Accordingly, because the instruction was properly given, appellate counsel will not be held ineffective for failing to raise a nonmeritorious issue. See Lugo, 2 So.3d at 21. The claim is denied.
2. Failure to Ensure a Complete Appellate Record
Barwick argues that direct appeal counsel rendered ineffective assistance in having failed to ensure a complete appellate record. Barwick identifies the following portions of the transcript as missing: (1) the general jury qualification; (2) a large portion of the charge conference; and (3) several bench conferences, occurring at the time of and pertaining to jury selection, the testimony of the lead detective on this case, the instructions to the jury in the guilt phase, and the defense’s penalty phase closing argument. Barwick does not, however, identify any errors that occurred as a result of the alleged omissions. We have previously rejected this claim under similar circumstances:
We deny relief on this claim. As we previously explained, [the defendant] has not sufficiently described how he was prejudiced by the lack of a record of the jury hardship excusáis by the trial judge. This Court has also previously rejected similar ineffective assistance of appellate counsel claims. In Thompson v. State [759 So.2d 650 (Fla.2000) ], the defendant alleged that “this Court was not provided with an adequate record during the direct appeal because some pretrial hearings and bench conferences were not transcribed and included in the appellate record.” Thompson, 759 So.2d at 660. Thompson alleged in his post-conviction motion that his trial and appellate counsel were both ineffective for failing to ensure that this record existed. We rejected Thompson’s habeas claim of appellate counsel’s ineffectiveness because Thompson had not alleged specific appealable errors in the record. Id.; see also Ferguson v. Singletary, 632 So.2d 53, 58 (Fla.1993) (“Had appellate counsel asserted error which went uncorrected because of the missing record, or had Ferguson pointed to errors in this petition, this claim may have had merit. However, Ferguson ... points to no specific error which occurred during these time periods.” (emphasis added)).
While [the defendant] has alleged generally that error occurred, as in Thompson, [he] has not pointed to specific error.
Bates v. State, 3 So.3d 1091, 1107 (Fla.2009); accord Pardo v. State, 941 So.2d 1057, 1073 (Fla.2006) (citing cases). Similarly, because Barwick has failed to specifically identify any errors that occurred as a result of the alleged omissions in the record, we deny this claim.
3. Failure to Argue the Jurors’ Sense of Responsibility Was Diluted
Barwick argues that appellate counsel was ineffective for failing to argue that during the penalty phase, the jury was misled by comments and instructions that diluted its sense of responsibility. Barwick raised the same underlying contention that the jury’s sense of responsibility at sentencing was diminished in the context of his claim of ineffective assistance of trial counsel. Barwick “is not permitted to camouflage the underlying argument as an ineffective assistance of appellate counsel claim.” Johnston v. State, 63 So.3d 730, 746 (Fla.2011) (citing Schoenwetter v. State, 46 So.3d 535, 562 (Fla.2010)).
Further, the Court has previously held that the standard jury instructions *109 given during the penalty phase, which appear to be the only “comments” made by the trial judge concerning sentencing, do not diminish the jury’s sense of responsibility. See Reese v. State, 14 So.3d 913, 919-20 (Fla.2009). Our review of the record also reflects that arguments made by the State are the same or similar to those the Court has previously upheld. Foster v. State, 518 So.2d 901, 902 (Fla.1987). This claim is denied.
4. Failure to Argue Prosecutor Injected Improper Considerations at the Penalty Phase
Barwick argues that certain comments by the State introduced improper matters for the jury’s consideration in deciding what sentence to recommend, including sympathy for the victim and fear of the defendant. He maintains this inflamed the passions of the jury such that their verdict was an emotional response to the crime and the defendant. Barwick also argues that the prosecutor injected fear of the defendant into the guilt phase in order to influence the jury’s verdict. Barwick therefore concludes that the cumulative effect of the improper arguments was to appeal to the jury’s passions and prejudices, which rendered the guilt and penalty phases of trial, and Barwick’s sentence of death, fundamentally unfair.
The arguments identified by Bar-wick were not objected to at trial; thus, challenges to the arguments on appeal would have been limited to review for fundamental error. Absent fundamental error, i.e., error that reaches “down into the validity of the trial itself to the extent that a verdict of guilty could not have been obtained without the assistance of the alleged error,” relief would not be warranted on appeal. Spencer v. State, 842 So.2d 52, 74 (Fla.2003) (quoting Brown v. State, 124 So.2d 481, 484 (Fla.1960)). Here, Barwick made no such showing. Accordingly, appellate counsel’s failure to raise a nonmeri-torious claim cannot constitute ineffective assistance. See Rutherford v. Moore, 774 So.2d 637, 643 (Fla.2000) (“If a legal issue would in all probability have been found to be without merit had counsel raised the issue on direct appeal, the failure of appellate counsel to raise the meritless issue will not render appellate counsel’s performance ineffective.”). Reviewed in context, we conclude that the arguments at issue were proper.
Addressing the charge of attempted sexual battery during his guilt phase closing argument, and in response to Bar-wick’s defense that he only intended to commit a burglary, the prosecutor reviewed Barwick’s admitted conduct of driving by the victim’s apartment complex, seeing her sunbathing, returning after retrieving a knife, and observing two women sunbathing. Recalling for the jury that Ms. Capers testified at trial that Barwick stared at her and she got an eerie feeling, the prosecutor argued that the testimony was evidence Barwick was “staring, selecting.” The State also pointed out that Bar-wick’s conduct in following Ms. Wendt into her apartment was inconsistent with intending only to commit a burglary. According to Barwick, the State’s argument was intended to frighten the jury and influence their verdict by appealing to their emotions. We disagree. Rather, taken in context and based upon evidence adduced at trial, the prosecutor’s argument addresses Barwick’s “burglary only” defense to the charge of attempted sexual battery. “The proper exercise of closing argument is to review the evidence and to explicate those inferences which may reasonably be drawn from the evidence.” Wade v. State, 41 So.3d 857, 868 (Fla.2010) (quoting Bertolotti v. State, 476 So.2d 130, 134 (Fla. *110 1985)), cert. denied, — U.S. —, 131 S.Ct. 1004, 178 L.Ed.2d 835 (2011).
In its closing argument in the penalty phase, the State argued that sympathy for either the victim or the defendant was not a proper consideration for the jury in reaching its decision:
The last thing I wanted to talk to you about, I’ll sit down then. I’ve been talking too long and you’re tired of it. Again, I appreciate your patience but I don’t want you to fall into sympathy. I can’t argue sympathy. It’s improper. I can’t sit here and show you the photograph and say, feel sorry for this young lady right here. But the only reason I can show you this photograph in life and in death is for this one right down here, which is particularly heinous, atrocious and cruel. That’s the reason the photographs are there. That’s the reason you can look at them. It is because of the pain that he inflicted, put upon her and the joy that he may have gotten out of it that I can talk about or I can even get close to these photographs or even point to these photographs or show these photographs to you.
Don’t get me wrong. I am not arguing sympathy but do not let the defense attorney sway you or inflame you with any sort of argument for sympathy.
The reason we’re here, there’s no money. It sort of falls in the category, poor fellow. He can’t help himself, poor fellow. Psychologists and psychiatrists can’t help him. Poor fellow. Me, the defense lawyer, I can’t help him. Poor fellow. All boils down to money because that’s why we can’t cure him. It is lack of ability is why we can’t cure him. Poor fellow. Everybody has given up on him, poor fellow, don’t y’all give up on him.
Don’t fall into that category. Don’t fall into that sympathy. Sympathy has no place in this courtroom. You are to follow this law. Do these aggravating circumstances outweigh these mitigating circumstances. And if you have any sympathy and if sympathy just comes in there, tell yourselves, no, Mr. Paulk told me we can’t have sympathy for that lady or that, the fact that she endured pain and she was being tortured. We can take that into consideration but don’t fall into that category that this man, that just on the basis of sympathy, sympathy alone that you are going to vote, to recommend to the judge that he be sentenced to life in prison with the possibility of parole after 25 years in prison. Don’t let sympathy make you vote that way.
We reject Barwick’s characterization of the foregoing argument as encouraging the jury to consider sympathy for the victim while ignoring sympathy for the defendant in reaching its sentencing recommendation. The argument is quite to the contrary, and is a correct statement of law.
Accordingly, we deny Barwick’s claims of ineffectiveness with respect to the State’s closing arguments at issue and counsel’s failure on direct appeal to challenge them, since appellate counsel will not be held ineffective for failing to raise a nonmeritorious issue. See Lugo, 2 So.3d at 21.
5. Failure to Challenge the Penalty Phase Jury Instructions as Shifting the Burden of Proof to the Defense
Barwick challenges the penalty phase jury instructions as shifting to the defense the burden of proving that the mitigating circumstances outweighed the aggravating circumstances and warranted a life sentence. This claim could and should have been raised on direct appeal. Dufour, 905 So.2d at 69. Accordingly, Barwick’s attempt to circumvent the pro *111 cedural bar by recasting his challenge to the instructions to one of ineffective assistance of direct appeal counsel is improper. Further, the Court has previously rejected this precise claim. See, e.g., Bell v. State, 965 So.2d 48, 79 (Fla.2007); Downs v. State, 740 So.2d 506, 509 n. 5 (Fla.1999). Barwick offers no basis for rejecting this long-standing rule of law. Thus to the extent that Barwick alleges appellate counsel was ineffective for failing to raise the substantive claim, relief is denied. See Rutherford, 774 So.2d at 643 (failing to raise nonmeritorious issue on appeal will not render appellate counsel’s performance ineffective).
C. The Aggravating Circumstance “During Commission of a Felony” Operates as an Impermissible Automatic Aggravator
Barwick challenges the constitutionality of the “during commission of a felony” aggravating circumstance, which, he argues, was duplicative of the basis for the death penalty, i.e., that the killing was a felony murder. Barwick did not raise this claim on direct appeal, and therefore, it is proeedurally barred. In any event, the Court has previously rejected this same claim. See, e.g., Dufour, 905 So.2d at 69 (citing cases); Blanco, 706 So.2d at 11; Johnson, 660 So.2d at 647 (citing cases).
D. Remand for Resentencing
Barwick argues that the Court should have remanded his case for resen-tencing upon determining on direct appeal that there was insufficient evidence to support the CCP aggravating circumstance. Because this claim should have been raised in a proper motion for rehearing on direct appeal, it is proeedurally barred. Robinson v. State, 913 So.2d 514, 523 n. 8 (Fla. 2005); Cherry v. Moore, 829 So.2d 873, 877 (Fla.2002). Barwick challenged the aggra-vator on direct appeal but did not seek rehearing on the Court’s harmless error analysis with respect to the improper aggravating circumstance.[18] Moreover, the Court has previously rejected this precise claim. Geralds v. State, — So.3d —, 2010 WL 3582955 (Fla.2010); Hardwick v. Dugger, 648 So.2d 100, 106 (Fla.1994).

IV. CONCLUSION

For the reasons stated above, we affirm the circuit court’s denial of Barwick’s motion for postconviction relief and deny his petition for a writ of habeas corpus.
It is so ordered.
PARIENTE, LEWIS, QUINCE, POLSTON, LABARGA, and PERRY, JJ., concur.
CANADY, C.J., concurs in result.

. The Court found reversible error where the trial court held that Barwiek lacked standing to challenge, under State v. Neil, 457 So.2d 481 (Fla.1984), the prosecutor’s use of peremptory challenges to remove three black venirepersons. Barwick, 547 So.2d at 612. In Neil, the Court condemned the use of peremptory challenges to exclude African Americans from serving on juries solely because of their race. 457 So.2d at 486-87. Subsequent to Barwick’s trial, but prior to his conviction becoming final, the Court decided Kibler v. State, 546 So.2d 710 (Fla.1989). Kibler held that a defendant need not be black to object to a peremptory challenge used to remove a black venireperson. Id. at 712.

. Barwick’s conviction following remand was while represented by the third lawyer appointed to represent him. His conviction came in a third trial, as a mistrial was declared shortly after the second trial commenced.

. In aggravation, the trial court found the following circumstances: (1) previous convictions for the violent felonies of sexual battery with force likely to cause death or great bodily harm and burglary of a dwelling with an assault; (2) the murder was committed during an attempted sexual battery; (3) the murder was committed to avoid arrest; (4) the murder was committed for pecuniary gain; (5) the murder was especially heinous, atrocious, or cruel (HAC); and (6) the murder was committed in a cold, calculated, and premeditated manner without any pretense of moral justification (CCP). Barwick, 660 So.2d at 689-90.

. The guilt-phase claims were: (1) the trial court erred in denying his motions to disqualify Judge Foster; (2) the prosecutor improperly used his peremptory challenges to exclude African Americans from the juiy; (3) the trial court erred in denying Barwick’s motion for judgment of acquittal on the attempted sexual battery charge; (4) the trial court erred in allowing Tim Cherry, Michael Ann's boyfriend at the time of the murder, to testify as to his blood type; and (5) the trial court erred in denying Barwick’s motions for mistrial after the prosecutor, through comments made during his opening and closing statements, improperly commented on Barwick’s silence. Barwick, 660 So.2d at 690 n. 8.

. The penalty-phase claims included: (1) the trial court erred in finding that the murder was committed during an attempted sexual battery; (2) the trial court erred in finding *92 that the murder was especially heinous, atrocious, or cruel; (3) the trial court erred in finding that the murder was cold, calculated, and premeditated; (4) the trial court erred in rejecting the nonstatutory mitigator of abuse as a child; (5) the death sentence was not proportionate in this case; (6) the trial court inadvertently instructed the jury to consider sympathy for the victim and erroneously instructed the jurors not to consider sympathy for the defendant in evaluating the sentence; (7) the instruction for the heinous, atrocious, or cruel aggravator was unconstitutional; (8) the trial court failed to instruct the jury on the mitigating circumstance of extreme duress; and (9) the trial court erred in denying Bar-wick's motion to preclude the death penalty based on alleged racial bias. Barwick, 660 So.2d at 690 n. 9.

. The twenty-one claims raised in the amended rule 3.851 motion and reasserted in the second amended motion were: (1) ineffective assistance of counsel during the guilt phase of trial pertaining to prosecution witness Suzanne Caper’s identification of Barwick; (2) violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), on the ground that the State failed to disclose exculpatory evidence pertaining to the charge of attempted sexual battery, and violation of Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), on the ground that the State permitted false testimony to be given pertaining to that charge and the testimony of Suzanne Caper; (3) trial counsel provided ineffective assistance with respect to the penalty phase of trial, having failed to properly investigate and prepare mitigating evidence, failed to properly prepare and utilize mental health experts, and failed to adequately challenge the State’s case; (4) cumulative error; (5) Barwick is ineligible for the death penalty pursuant to Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), and section 921.177, Florida Statutes (2010), because he is mentally retarded; (6) Barwick is entitled to a trial by jury on the issue of mental retardation pursuant to Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002); (7) Florida’s capital sentencing scheme is unconstitutional under Ring; (8) Barwick’s death sentence is invalid because the indictment did not charge the elements of the offense necessary to establish capital murder, having failed to specify whether the first-degree murder charge was felony murder or premeditated murder; (9) counsel had a conflict of interest; (10) the general jury qualification procedure used by Bay County Circuit Court violated Barwick’s federal and state constitutional rights and trial counsel was ineffective in not litigating that issue; (11) trial counsel was ineffective for failing to argue against the “avoid arrest” aggravating circumstance and not objecting to the jury being instructed on the inapplicable aggravator; (12) denial of a proper appeal due to omissions in the record, also resulting in a denial of the effective assistance of post-conviction counsel; (13) jury instructions and comments misled and diluted the jury’s sense of responsibility for deciding Barwick’s sentence; (14) the State’s arguments introduced impermissible consideration for the jury and counsel was ineffective for failing to raise proper objections; (15) the finding that the murder occurred during the commission of a felony as an aggravating circumstance resulted in an automatic aggravating factor as it was duplicative of felony-murder as basis for death sentence; (16) death penalty jury instructions unconstitutionally shifted the burden to Barwick to prove that death was inappropriate, and counsel rendered ineffective assistance for failing to object to the instructions; (17) the Florida Supreme Court erred on direct appeal after striking the CCP aggravating circumstance; (18) Florida Rule of Professional Conduct 4-3.5(d)(4) violated Barwick’s due process in that counsel was ethically prohibited from interviewing jurors who sat on his trial; (19) Florida’s death penalty sentencing statute is unconstitutional because it fails to prevent the arbitrary and capricious imposition of the death penalty and for violating the guarantee against cruel and unusual punishment, and trial counsel or appellate counsel was ineffective to the extent the claim was not properly litigated; (20) *93 Barwick is innocent of committing first-degree murder and of the death penalty; and (21) execution by lethal injection and Florida’s laws pertaining to the method of execution violate the constitution.

. Huff v. State, 622 So.2d 982, 983 (Fla.1993) (requiring a hearing in capital postconviction cases to determine whether an evidentiary hearing is required with respect to the post-conviction relief claims raised and to permit legal argument by the parties on the matter).

. An evidentiary hearing was held on claims 1, 2, 3, and 10.

. The new claims relied upon Roper v. Simmons, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005), wherein the United States Supreme Court held it unconstitutional to sentence to death an individual who was under the age of eighteen at the time of the murder. Id. at 578, 125 S.Ct. 1183. Claim 22 challenged the death sentence on the basis that Barwick, while chronologically eighteen when he committed the murder, was brain damaged and mentally and emotionally under the age of eighteen at that time; in Claim 23, Barwick argued that his death sentence was in violation of Roper because a prior violent felony used in aggravation was committed when he was under the age of eighteen.

. Barwick presented Dr. Eisenstein, a psychologist, who addressed Barwick’s mental health issues, and Frank McKeithan, the State's lead investigator in the case, who testified about the initial processing of the case. Barwick's trial attorney, Robert Adams, was unavailable to testify, having been deceased for a number of years. The State called Alton Paulk, lead prosecutor in the case, who testified concerning the presentation of evidence at trial, and Don Cioeta, the crime scene investigator, who testified concerning details of the crime scene.

. Barwick raises the following claims on appeal: (1) the postconviction court erred in denying Barwick’s ineffective assistance of counsel claim with respect to the penalty phase; (2) the postconviction court erred in denying Barwick’s ineffective assistance of counsel claim with respect to the guilt phase; (3) the postconviction court erred in denying Barwick’s Brady and Giglio and prosecutorial misconduct claims; (4) the postconviction court erred in denying Barwick’s cumulative error claim; (5) the postconviction court erred in denying Barwick’s ineffective assistance of counsel claim with respect to the jury qualification procedure in Bay County; (6) the postconviction court erred in denying Barwick’s ineffective assistance of counsel claim with respect to the "avoid arrest” ag-gravator; (7) the postconviction court erred in denying Barwick's ineffective assistance of counsel claim with respect to omissions in the record on direct appeal; (8) the postconviction court erred in denying Barwick’s ineffective assistance of counsel claim with respect to comments by the prosecutor and court that diminished the jury's sense of responsibility; (9) the postconviction court erred in denying Barwick’s ineffective assistance of counsel claim with respect to improper argument by the State; (10) the postconviction court erred in denying Barwick’s ineffective assistance of counsel claim with respect to the "during commission of a felony” aggravator; and (11) the postconviction court erred in denying Barwick's ineffective assistance of counsel claim with respect to an alleged burden-shifting instruction.

. Barwick raises the following claims in his habeas petition: (1) whether the execution of *94 Barwick, a brain-damaged, mentally retarded person, would be unconstitutional; (2) whether the State violated Barwick’s rights when it used crimes he had committed as a juvenile as an aggravator; (3) whether appellate counsel was ineffective in failing to argue against the "avoid arrest" aggravator; (4) whether appellate counsel was ineffective in failing to raise the issue of omissions in the record; (5) whether appellate counsel was ineffective in failing to argue that the sentencing jury was misled by improper comments and instructions that diluted its sense of responsibility; (6) whether appellate counsel was ineffective in failing to argue that the prosecutor presented impermissible considerations to the jury; (7) whether the “during commission of a felony” aggravator operates as an impermissible automatic aggravator; (8) whether appellate counsel was ineffective in failing to argue that the penalty phase instructions improperly shifted the burden; and (9) whether the Florida Supreme Court erred in failing to remand for resentencing after striking an aggravator.

. Ms. Capers is referred to as Suzanne Capers throughout the trial transcript, by the parties, and in the circuit court’s order denying postconviction relief. At trial, however, Ms. Capers expressly answered on the record that her name was Suzanna, not Suzanne.

. The Court previously affirmed the denial of Barwick’s motion for acquittal on the charge of attempted sexual battery. See Barwick, 660 So.2d at 694-95. The evidence included Bar-wick’s admission to observing the victim sunbathing, returning to the same location after obtaining a knife from his house, passing by the victim a number of times, entering her apartment only after she had entered, as well as evidence that the victim’s bathing suit bottom in the back had been pulled down, and DNA testing results of a semen stain found on the comforter wrapped around the victim, revealing that Barwick was within two percent of the population that could have left the stain. Id. at 695.

. Barwick also argues that appellate counsel was ineffective based upon an incomplete record on appeal. We review that claim as raised in his petition for writ of habeas corpus.

. Testimony at trial was not that the entire bathing suit bottom was pulled down, but that the bottom was pulled down in the back.

. Alternatively, Barwick argues that to the extent trial counsel should have been aware of the investigative reports, he was ineffective in failing to discover and use the information therein. Barwick contends counsel should have questioned the crime scene investigator at trial on the possibility that the victim’s bathing suit bottom had been pulled down as the result of her being dragged on the floor. This claim is without merit. In his statement to police, Barwick explained that he carried Ms. Wendt to the bathroom after stabbing her to death, i.e., not that he dragged her. In addition, when asked how the victim’s bathing suit bottom had been pulled down, Bar-wick answered that it must have happened while he and the victim were struggling. Thus, Barwick's own admission does not support the theory he argues trial counsel was ineffective for not pursuing.

. On rehearing, Barwick sought relief with respect to his claim that the trial court erred in rejecting his childhood abuse as a mitigating circumstance.